UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 03-CV-12249-DPW

DONALD A. BRISSON,

    Plaintiff

v.

CITY OF NEW BEDFORD and NED K.
LEDUC,

    Defendants

**EXHIBITS TO
DEFENDANTS NED LeDUC AND CITY OF NEW BEDFORD'S
JOINT L.R. 56.1 STATEMENT OF UNDISPUTE FACTS**

DEFENDANTS
NED LeDUC and
CITY OF NEW BEDFORD,

By their attorneys,

Joseph L. Tehan, Jr. (BBO# 494020)
Gregg J. Corbo (BBO# 641459)
Kopelman and Paige, P.C.
31 St. James Avenue
Boston, MA 02116
(617) 556-0007

245131/60700/0499

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

```
*******************************
                              *
DONALD A. BRISSON,            *
        Plaintiff             *
                              *
                              *    CIVIL ACTION
        VS                    *    NO. 03-CV-12249-DPW
                              *
CITY OF NEW BEDFORD and       *
NED K. LEDUC,                 *
        Defendants            *
                              *
*******************************
```

DEPOSITION OF DONALD A. BRISSON, taken on behalf of the defendant pursuant to the Massachusetts Rules of Civil Procedure before Kathleen M. Benoit, CSR # 1368F94, Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts at the offices of Kopelman and Paige, 31 St. James Avenue, Boston, Massachusetts, on Wednesday, November 24, 2004, commencing at 10:31 a.m.

APPEARANCES:

JAMES R. McMAHON, III, ESQ., Law Offices of James R. McMahon, III, 25 Main Street, Buzzards Bay, MA 02532-0313, For the plaintiff

GREGG J. CORBO, ESQ., Kopelman and Paige, 31 St. James Avenue, Boston, MA 02116, For the defendants

AUSTIN M. JOYCE, ESQ., Edward P. Reardon, P.C., 397 Grove Street, Worcester, MA 01605, For the defendant, Ned K. Leduc

## Leavitt Reporting, Inc.

1207 Commercial Street, Rear
Weymouth, MA 02189

Tel. 781-335-6791
Fax: 781-335-7911
leavittreporting@att.net

Hearings ◆ Conferences ◆ Legal Proceedings

1    Q.  And how long have you been at that address?

2    A.  Since, this is going on my third year there.

3    Q.  And what is your occupation?

4    A.  I'm a lawyer.

5    Q.  Do you have a field of specialty?

6    A.  Yes, I do trials and appeals.  Most of my practice

7  is defense of the accused, most of my, my trial practice

8  is defense of accused and most of my appellate practice is

9  defense of the accused.  I have a small civil practice.

10    Q.  Are you sole practitioner?

11    A.  I am.

12    Q.  Do you have any associates?

13    A.  I do not.

14    Q.  What is your relationship to Kelly Martin?

15    A.  Kelly Martin is an attorney in New Bedford.  I

16  first met Kelly in law school.  She was, I think, one or

17  two years ahead of me, I'm not sure, but she did graduate

18  before I did.  And we became friends.  She ran for city

19  counsel and counselor-at-large and I helped her with her

20  campaign.  We have referred cases to one another.

21    Q.  Does she ever assist you on cases?

22    A.  No.  Well, let me ask you, assist in terms of, I

23  mean second seat me in cases or?

1    Constitution.  There are some from Mass. Rules of Criminal

2    Procedure, but generally it's, you know, you're dealing

3    with Fourth Amendment, Fifth, Sixth, Eight Amendment.

4        Q.   In the seminars?

5        A.   You know, I can't say that I've ever been to a

6    seminar which dealt -- let me take that back.  I've been

7    to search and seizure seminars, so I guess you're talking

8    about Fourth Amendment, and Article 14, Article 12.

9        Q.   And do you teach any classes?

10       A.   I do, I teach at the University of Massachusetts

11   at Dartmouth.  I teach a criminal due process course there

12   to undergrads.

13       Q.   What type of topics do you cover there?

14       A.   We cover the basics, the Fourth, Fifth, Sixth,

15   Eighth Amendment and Articles 12 and 14.

16       Q.   How long have you been teaching that for?

17       A.   I started in January this year.  That was my first

18   semester.  This is my second semester now.

19       Q.   You mentioned previously that you were in the

20   Marine Corps?

21       A.   Yes.

22       Q.   What were your dates of service?

23       A.   I entered the Marine Corps I believe on June the

1   being admitted to their school, so they stood nothing to
2   gain by admitting me. I stood everything to gain.
3        Q. So you had to plead your case in both schools?
4        A. I had to plead my case in both schools, yes.
5        Q. And you weren't willing to take a no for an
6   answer?
7        A. No, I did not take no for an answer.
8        Q. Prior to today, when was the last time you spoke
9   with Steven Furtado?
10       A. The last time I spoke with Mr. Furtado was right
11  after he was released from the Navy which was I want to
12  say a couple of days after he was held at the New Bedford
13  police station. It was shortly after that.
14       Q. So it was in October of 2000?
15       A. Yes.
16       Q. Have you tried to contact him since then?
17       A. I may have tried to contact him back in October of
18  2000, perhaps in November of 2000, because he had owed me
19  some money, but other than that, no.
20       Q. Did you try to contact him prior to filing this
21  lawsuit?
22       A. There was some discussion about trying to find him
23  but I never made that affirmative step to find him.

1    Q.  Did you ever --

2    A.  I think we were considering hiring a private

3    investigator to try and locate him, but I never followed

4    through with giving the investigator any info about

5    Steven.

6    Q.  Did you and Steven ever talk about filing a

7    lawsuit as a result of the incidents on October 6 of 2000?

8    A.  No.

9    Q.  And are you aware as to whether or not he ever

10   tried to file a lawsuit based on that incident?

11   A.  I have no idea what he's done.

12   Q.  When did your representation of Mr. Furtado begin?

13   A.  I think that it began the night before the court

14   date.  If I remember correctly, his girlfriend worked at

15   the same place as my wife, and I spoke with his girlfriend

16   and his mother that night and went down to the, went down

17   to Ash Street to see about bail for him, and I believe the

18   next day we were in court.

19   Q.  And that day was October 6, 2000?

20   A.  I believe it was.

21   Q.  And what was the purpose of that court date?

22   A.  Steven had been charged with I believe operating

23   after suspension and a civil motor vehicle infraction.

1      Q.  And he had been arrested on those charges?

2      A.  Yes.

3      Q.  By what Police Department?

4      A.  I'd have to look at the complaint.  I don't

5   recall.

6      Q.  And what was the court proceeding, was it an

7   arraignment?

8      A.  Yes, that's the first date in the criminal

9   process.

10      Q.  And so you met Mr. Furtado for the first time that

11   morning prior to the arraignment?

12      A.  No, I said I met him that night at Ash Street to

13   see if I could arrange for bail.  I spoke to Cynthia

14   Barbosa I believe is the clerk's name who was doing a

15   bail's advocate.  Cynthia's a former New Bedford police

16   officer.

17      Q.  Did he make bail?

18      A.  No.  She did not want to bail him.  She held him

19   without.

20      Q.  And so when was the next time you saw Mr. Furtado?

21      A.  In court the next morning.

22      Q.  Now, other than the charges for which he was being

23   arraigned, were there any other outstanding criminal

1    can't get into the substance of those conversations.    I
2    have not spoken to Steve and I don't have his consent to
3    talk about what he and I talked about.    That would be a
4    violation of the Mass. Rules of Professional
5    Responsibility.    I can tell you what happened in court,
6    it's a matter of record, public record, but I can't tell
7    you what we talked about.

8        Q.    That's fine, I'll accept your assertion of the
9    privilege as to that question.    However, we are going to
10    reserve our rights to either move to compel or to exclude
11    other similar evidence and I'll move on.

12                So the criminal charge is dismissed on
13    payment of court costs?

14        A.    Yes.

15        Q.    What happens next?

16        A.    What happens?

17        Q.    Strike that.    What happened next with respect to
18    Mr. Furtado?

19        A.    He was taken downstairs to be released, and I had
20    assumed that he was given his personal effects and
21    whatever to be released.    Unfortunately, that didn't
22    happen, but.

23        Q.    Well, what did happen?

1    A.   I was not present when he was put into the cell by
2    the court officers, no.  I do know he was in a cell
3    because eventually I made my way downstairs to the lockup
4    and saw him in the cell.

5    Q.   How did you know to go downstairs at that point?
6    A.   I had overheard Sergeant Conley talking with ADA
7    Saunders, and they were talking about arresting him and
8    taking him to New Bedford police station.

9    Q.   And so what did you do at that point?
10   A.   I spoke to Saunders and Sergeant Conley.

11   Q.   And what was the substance of that conversation?
12   A.   I reminded them that Judge Turcotte had decided
13   that the correspondence they had from the Navy was not a
14   detainer or warrant fugitive from justice complaint and as
15   a result wasn't sufficient to arrest him on, and that
16   Judge Turcotte had ordered his release.

17   Q.   When did this come up, this issue of the Navy
18   detainer come up with Judge Turcotte?

19   A.   ADA Saunders brought it up when Judge Turcotte --
20   when we had resolved the criminal matter, ADA Saunders
21   brought this correspondence up and showed it to Judge
22   Turcotte.

23   Q.   Did you see it at that point?

1   about?

2      Q.  Any files, any, do you have any documents
3   pertaining to Mr. Furtado from the United States Navy in
4   your possession?

5      A.  I have no such documents in my personal file
6   relating to this case.  I don't know, I don't remember
7   whether or not I even have a copy in Mr. Murphy's file
8   that I may still have.  I have not gone through that file,
9   and I have not gone through that file because I do not
10  have consent to divulge what's in that file from my
11  client.

12             MR. CORBO:  Okay, again, just for the
13  record, we're going to reserve our rights to, be it compel
14  or exclude.

15     Q.  So let's back it up again a little bit.  When was
16  the first time you were made aware of the Navy's interest
17  in having Mr. Furtado detained?

18     A.  At Ash Street.

19     Q.  At Ash Street which is October 5, the night of
20  October 5?

21     A.  Probably it would have been October 5.

22     Q.  Is that the reason that he was not released on
23  bail?

1   gone downstairs after that.

2       Q.   Was there any suggestion by either the ADA or

3   Sergeant Conley that Mr. Furtado would be taken into

4   custody for some other reason than the Navy detaining?

5       A.   No, no, and if there were another reason to hold

6   him, I can't imagine why Mr. Saunders didn't say it in

7   front of Judge Turcotte.  You know, if there were a

8   warrant, warrant checks are run, probation in the morning

9   runs the warrant checks on prisoners, actually on anybody

10  on the list to make sure there are no other outstanding

11  warrants so people aren't released who have a warrant who

12  should be held.  So I would think that they ran NCIC on

13  Mr. Furtado and nothing came up.  I believe that's their

14  general practice.

15      Q.   So as far as you were concerned, the only reason

16  he was being held was because of this Navy detainer?

17      A.   I think that was, I think that was as far as

18  Mr. Saunders was concerned and Sergeant Conley was

19  concerned because that's what he told me he was going to

20  hold him on.

21      Q.   And as far as you were concerned?

22      A.   Yeah.  Yeah, nobody ever mentioned anything else.

23  And I'm assuming there were nothing else because

1    Mr. Furtado wasn't charged with any, I mean I'm not aware
2    that he was charged with another crime as a result of
3    this.  You know, this was his first, I believe his first
4    charge.  He was operating after suspension.  You know,
5    he's not, he certainly didn't strike me as the kind of
6    person who would be picking up charges left and right.
7    And the other reason too is when he went to Ash Street,
8    when they booked him into Ash Street, they run the NCIC.
9    They run checks to make sure that folks don't have
10   warrants in other counties or other courts, and the clerk
11   never mentioned anything else other than that
12   correspondence from the Navy; otherwise, she would have
13   bailed him.  And if he had a warrant, he would have never
14   got bailed, or if he had a federal detainer, especially a
15   fugitive from justice warrant, he wouldn't have gone
16   anywhere.

17        Q.  During this conversation between Sergeant Conley
18   and the assistant district attorney, did Sergeant Conley
19   indicate to you that they wished to question Mr. Furtado
20   for any reason?

21        A.  No, no, no.

22        Q.  Okay, so you go downstairs to the lockup area and
23   what happens next?

40

1    A.  I didn't see that part.

2    Q.  So what happened after your conversation with

3    Sergeant Conley now?

4    A.  I went with the receipt to the court officers.

5    Q.  And then what?

6    A.  I think it was Andy called upstairs, confirmed

7    that payment had been made.  Ramos said something about

8    the name wasn't on the receipt which names are never on

9    the receipt.  I don't know why he said that, but.

10   Q.  So at some point you testified that Mr. Furtado

11   was released by Ramos into the custody of Sergeant Conley?

12   A.  Yes, Ramos indicated when Sergeant Conley came to

13   the door that he was released to his custody.

14   Q.  And so what happened next?

15   A.  I went upstairs.

16   Q.  And then what?

17   A.  I asked the clerk to call to put the case back on

18   the list.

19   Q.  And then what happened?

20   A.  They called the case again and I told Judge

21   Turcotte what happened downstairs.

22   Q.  Was the ADA involved at that point?

23   A.  Yes.

43

1     A.   They wanted to know if they could go.

2     Q.   How many people were there?

3     A.   I think there was his mother, his girlfriend at

4     the time, his sister and her boyfriend or the guy was his

5     brother and the girl was his girlfriend.  I'm not, those

6     two I'm not sure about their relationship.  So I think

7     that there were four.

8     Q.   Was Kelly Martin there with you at that time?

9     A.   No.

10    Q.   And did you all go over to the police station

11    together?

12    A.   No.

13    Q.   You went on your own?

14    A.   They had their own, I don't know how they got to

15    court but they had their own, I don't know who was driving

16    but they had their own transportation.

17    Q.   Now, at this point prior to arriving at the police

18    station, had you -- well, strike that.

19              At this point between the time that

20    Mr. Furtado was taken into custody and the time that you

21    arrived at the police station, did you have any contact

22    with him?

23    A.   No, not on the way to the police station.

1      Q.  Okay, so what happened next?  You left to go to

2  the police station?

3      A.  Yes.

4      Q.  And then what happened?

5      A.  I got to the police station on Rockdale Ave., and

6  went into the front lobby waiting area and went to the

7  desk.

8      Q.  Did the family arrive at the same time you did?

9      A.  I don't, I don't know if it was at the same time

10  or a second or two later.  I don't, I don't remember.

11      Q.  Do you know the names of any of these people by

12  the way?

13      A.  No.

14              (Pause.)

15      A.  No, I don't remember any of their names.

16      Q.  Okay, so you arrived at the police station and you

17  approached the desk officer.  Now, prior to beginning your

18  conversation with the desk officer --

19      A.  Yes.

20      Q.  -- had you had any contacts with Steven Furtado?

21      A.  I got a call as I entered the front area.  I don't

22  know if they call it the foyer or the waiting area.

23      Q.  And what was the substance of that call?

1    A.   He basically was, he was, he seemed upset, they

2   were asking him questions and asking him to sign

3   documents.  He didn't know what documents they were asking

4   him to sign.

5        Q.   What did you tell him?

6        A.   I told him that I was at the police station now,

7   that he shouldn't say anything, he shouldn't sign

8   anything, that I'd be in to see him in a little bit.

9        Q.   Okay, so what happened next?

10       A.   I asked the desk officer if, I identified myself

11   to him and told him that I represented Steven Furtado and

12   that I would like to see him.

13       Q.   Who was the desk officer?

14       A.   I didn't know at the time, but now I know.  It was

15   Officer Ned Leduc.

16       Q.   And what was his response?

17       A.   He would, he said he would contact the sergeant in

18   the booking area and have him talk to me.

19       Q.   What happened next?

20       A.   At some point I got buzzed in or let in.  I don't

21   know, I can't remember whether there's a buzzer or

22   somebody just lets you in, but I went in through a door

23   and into another area and I was met by Sergeant Winterson.

1  know he didn't tell me who the next person in the chain of
2  command was.

3      Q.  After Sergeant Winterson told you that you
4  couldn't go back to see Mr. Furtado, did your demeanor
5  change?

6      A.  I think at that point I was getting frustrated.

7      Q.  And did that affect how you dealt with people?

8      A.  Did that affect... I think, I'm trying to remember
9  when I went through that door.  I know the family had
10  spoken to me, wanted to know what was going on, and I may
11  not have given them the entire rundown of what had
12  happened because I was frustrated.  I think I may have
13  just said they're not letting me see him, we've got to
14  wait for the lieutenant to come, and then I might, if I
15  had not been frustrated, I might have told them exactly
16  what was said, so I think I was a little short in that
17  respect with them, but as far as going to the desk
18  sergeant, no.

19      Q.  How about your demeanor towards Sergeant
20  Winterson, did it change after he told you you couldn't go
21  back to see Mr. Furtado?

22      A.  That I was a security risk?

23      Q.  Yes.

1    time.  You know, maybe, it certainly could have appeared
2    that I was frustrated.  There again, you know, the other
3    thing too is you've got this Plexiglas, so.  Anyway, I
4    asked him if there was somebody else.  He said yes, he
5    would call Lieutenant Latino; he was on the road.

6        Q.   What was it about the Plexiglas?

7        A.   You have a Plexiglas that you've got to talk
8    through, and every time I talk through those things I'm
9    never sure if I'm being heard on the other side, so it's
10   not the conversation tone, you know.

11       Q.   So you raised your voice?

12       A.   I did.  But I do with all Plexiglas that I have to
13   talk through to make sure that I'm heard.

14       Q.   Now, between the time when Sergeant Winterson left
15   you and the time that you approached Officer Leduc for the
16   second time, did you have any contact with Mr. Furtado?

17       A.   No.

18       Q.   Okay, so then Leduc says he's going to call
19   Sergeant Latino?

20       A.   No, Lieutenant Latino.

21       Q.   Lieutenant, sorry about that.  What happened next?

22       A.   I went over to the family or was standing with the
23   family.

1   time, except to say that he was not doing very well back
2   there.

3       Q.  Okay, so after the second call you go back to the
4   desk officer and then what happens?

5       A.  I'm telling him that I think, even showed him my
6   cell phone, it was a flip phone, you know, he's calling me
7   again, he's telling me you guys are still asking him
8   questions, you're asking him to sign documents, what is it
9   that you're doing back there.  And I know I asked him
10  where Lieutenant Latino was, if he was actually coming
11  into the station.

12      Q.  And what was his response?

13      A.  He did not know what questions were being asked or
14  what documents he was being asked to sign and he had just
15  gotten off the phone with Lieutenant Latino and Lieutenant
16  Latino was on his way in, a similar response to what I got
17  the first time.

18      Q.  And what was your demeanor like during the second
19  conversation?

20      A.  During the second conversation I was, I was
21  frustrated.  I was concerned about Steven.  I thought that
22  something was going on back there and I wasn't sure if
23  Lieutenant Latino was going to show up.

1      Q.   Were you angry?

2      A.   No, not angry, frustrated; frustrated and

3   concerned, not angry.  First of all, Officer Leduc is a

4   desk sergeant.  He wasn't a sergeant; he was a patrol

5   officer.  The only thing he could do for me was what he

6   did do for me.  It was to get the lieutenant in.  The one

7   thing I suppose he could have done that he didn't do was

8   to call back there and say, hey, you know, Brisson's out

9   here, his client's called him twice and somebody from out

10  there come back here and tell him what's going on with his

11  client back there.  That's the one thing he didn't do

12  which I wish he would have done but he didn't do that.

13  I'm not angry at him.  I'm frustrated at this time.  I'm

14  frustrated and I'm concerned for Mr. Furtado.

15     Q.   How was your frustration conveyed?

16     A.   I think at that point I raised my voice a little

17  more than I had on the last couple of occasions.

18     Q.   Were you yelling?

19     A.   No, I wasn't yelling, but I did, but I know that I

20  was, I know that I was talking louder this time than I had

21  in the last occasion.  You're standing there and you have

22  your client calling you, you're concerned about his

23  emotional status, he's telling you something is happening

1      A.   Yes.

2      Q.   How long had your conversation been going on at

3    that point?

4      A.   Seconds.  It was not a long conversation by any

5    stretch of the imagination.

6      Q.   Prior to Officer Sampson intervening, what did

7    Leduc say to you?

8      A.   He didn't know what questions were being asked, he

9    didn't know what documents were being asked to sign, and

10   Lieutenant Latino, he had just gotten off the phone with

11   him again and he was on his way in.

12     Q.   Did you follow up with a question after that?

13     A.   I didn't have the opportunity -- oh, with Officer

14   Leduc?

15     Q.   Yes.

16     A.   No, I didn't have the opportunity.

17     Q.   Were you about to ask another question?

18     A.   I was.

19     Q.   And then what happened?

20     A.   That's when Officer Sampson intervened.

21     Q.   And how did you respond to Officer Sampson?

22     A.   I don't know how to describe this, but if somebody

23   says something to you that you least expect, something

1   that just blows your mind and you just, part of you cannot

2   believe that you just heard what you heard but you know

3   you heard what you heard, I did something like, what did

4   you say? And she repeated what she said. And I said "I

5   ain't standing in no corner for nobody." I used the word

6   "freaking" to describe the corner as opposed to that

7   four-letter word that she used.

8        Q.  So you didn't use a four-letter word?

9        A.  No, I substituted it with freaking.

10       Q.  So at that point were you yelling?

11       A.  Oh, at that, yeah, at that point I was not

12  yelling. You know, at that point I was certainly louder

13  than I had been but not yelling. Yelling, I certainly

14  could have, I could have raised my voice even more if I

15  had wanted to, so I wasn't at the top of my, what it could

16  have been. I wasn't yelling but I certainly was loud and

17  was taken aback by being told to go stand in the corner.

18  I don't think I've been told to go stand in a corner since

19  I was a kid.

20       Q.  Angry at that point?

21       A.  No, at that point I'm dumbfounded. I can't

22  believe, I couldn't believe then, I can't believe now that

23  I heard what I heard, and I figured that once I said, What

1   did you say she would have said, oh, shoot, I shouldn't

2   have said that and cleaned it up a little bit on the

3   second go-around. You know, sometimes you slip. Well,

4   she didn't even do that. I'm thinking, oh, I can't

5   believe what's happening here. This is, this is like,

6   this is a nightmare, I don't get it, and I didn't have

7   much time to do much thinking beyond that because then Ned

8   Leduc intervened, Officer Leduc at that point.

9       Q.   Now, did you feel like you did anything to provoke

10  such a response from Officer Sampson?

11      A.   No.  Let me ask you, what, what would, I'm at a

12  loss as to what anyone could do to provoke that kind of

13  response.  Why would an officer, a police officer, tell

14  someone to go stand in the effing corner.  I can't imagine

15  a situation that they would do that.  To me that's just,

16  first of all, she, if she felt that my tone was louder

17  than it should have been, perhaps she should have lowered

18  her tone enough to control the situation and not raised

19  her tone and then just got the situation out of control.

20  I don't know, what could you do to get that kind of

21  response?  Go stand in the, you know, the corner.  Not

22  once, twice.  Twice.  And after that Officer Leduc

23  intervened.

1     Q.   And what did he say?

2     A.   He asked me to leave.  He told me to leave.

3  You've got to leave now or we're going to arrest you for

4  trespassing.

5     Q.   And what was your response?

6     A.   I, honestly, I got scared.  I mean nobody wants to

7  be arrested.  Nobody wants to be cuffed, taken off to

8  court and, well, I shouldn't say nobody.  I certainly did

9  not want to be arrested.  Did not want to, you know, I

10  don't want that to happen.  I don't think most people ever

11  want that to happen to them.

12             So now I'm like, oh, no, now my personal

13  freedom is now at stake.  So now I'm trying to think what

14  should I do, what can I do to make this right and to still

15  protect Steven.  I didn't have much of an opportunity to

16  think because he got up from around his desk and came

17  through the doors and met me in the lobby.

18     Q.   So after he told you to leave or you'll be

19  arrested, did you respond?

20     A.   I said something like I can't leave, I can't

21  leave, I can't leave Steven back there without knowing

22  what's going on, and then that's when he came out from

23  behind the desk and I told him I couldn't leave.

1    A.  we stood, he came up to me and was very close.  we
2    were probably no more than 6 inches apart.  I had so many
3    things going through my mind it didn't even bother me that
4    he was that close.  Usually I don't like people that
5    close, but I never even thought about that.  At that time
6    I got a third call from Steven just as he was coming out
7    from the door.  Again, with the same thing, they're asking
8    me questions, they want me to sign some papers.

9    Q.  And he doesn't know what those questions or papers
10   are?

11   A.  I didn't ask him this time.  I didn't have time to
12   ask him.  I've got, I've got Ned Leduc coming through the
13   doors potentially arresting me and I've got my client on
14   the cell phone in a panic and I'm trying to figure out
15   what to do, and there's not a whole lot of time to think
16   about this.  I know that I showed Officer Leduc the phone,
17   I said, Look, he's calling me again, he's asking me what
18   to do.  What are your guy's asking.  He doesn't know and I
19   need to leave.  If I don't leave, he's going to arrest me
20   for trespassing.

21   Q.  What was your response?

22   A.  I said, and I still had my client on the other
23   end.  I said, "I can't leave.  I cannot leave until I find

1    out what's happening to him.  What's going on back there?"

2    Although, a part of me did want to leave, but.  After I

3    said that, he said, "Okay, you're under arrest."  I

4    remember telling Steven, "I'll be in to see you in a

5    minute" on the phone.  I turned to somebody in his family

6    and asked them to call my wife and see if she could come

7    down and bail me out.  It was probably his girlfriend

8    because she worked with my wife.

9        Q.  So between the time of the first call and the time

10   of the third call, how much time went by?

11       A.  I don't, I don't remember but in the phone

12   records, if I looked at the phone records, I could tell

13   you.  It wasn't a lot of time.  Things happened, things

14   happened fast.

15       Q.  Now, when Officer Leduc told you you were under

16   arrest --

17       A.  Yup.

18       Q.  -- did he put you in cuffs?

19       A.  No.

20       Q.  What happened?

21       A.  He showed me, you know, with his hand he did a

22   motion like this (indicating), you know, how you motion

23   somebody to come this way, that's what he did.  I walked,

1    I walked ahead of him actually through the first door
2    entryway, and I was going to go to the booking room that
3    you take a left, you go to the door on the left where
4    Sergeant Winterson came out, but Officer Leduc motioned
5    for me, told me to come over to this way, the door that he
6    came, you know, that room that's behind the Plexiglas.  He
7    asked me to have a seat by his desk and he had a seat.  He
8    sat at his desk.  So now I'm in the room that's on the
9    other side of that Plexiglas with those people there.

10   Q.   Then what happened?

11   A.   We talked about the situation.  I explained to him
12   what happened at court, my concerns about Sergeant Conley
13   taking Mr. Furtado, and we, the fact that I didn't know
14   what questions were being asked, Steven had called me
15   three times, and I think the conversation lasted I want to
16   say a good five minutes or so.  And I know that Sergeant
17   Ribeiro heard part of the conversation, and I'm not sure
18   what happened with Officer Sampson because I don't have, I
19   don't remember any interaction with her after she told me
20   to go stand in the corner the second time.

21   Q.   Okay.  And what was Officer Leduc's demeanor
22   towards you during the five-minute conversation?

23   A.   It was, you know, normal conversation.  It was a

LEAVITT REPORTING, INC.

1       A.   What do you mean?

2       Q.   Where is the bench located?

3       A.   In the booking room.

4       Q.   In the booking room?

5       A.   Yeah.

6       Q.   And did you ever find out what Steven was being

7    asked?

8       A.   Yes, the other officer told me.  I believe his

9    name is Tetreault.  I'm not absolutely certain, I believe

10   that's his name, but Officer Tetreault told me.

11      Q.   And what did he say?

12      A.   And Officer Tetreault also showed me what they had

13   asked him to sign.

14      Q.   And what was it?

15      A.   Officer Tetreault said it was routine booking

16   questions, and I believe the document was his Miranda

17   warning.

18      Q.   Was there anything else?

19      A.   I don't believe so.  I don't know if, I don't know

20   if Steven had to sign for his property, a receipt for the

21   property.  I don't remember that.  It may have been.

22      Q.   But he wasn't being asked to sign any kind of

23   confession?