1     A.   A confession as to any crime?

2     Q.   Yes.

3     A.   No.  However, however there are, there is a

4  question that isn't in the routine booking that I was kind

5  of concerned about which ended up being answered in a way

6  that would not jeopardize his relationship with the Navy,

7  his discharge.

8     Q.   Did he sign the form?

9     A.   He had not signed the form when I was in there.  I

10  don't know if he signed the form eventually, but when I

11  walked in he had not signed.  Sergeant Tetreault showed me

12  the form.  He showed me the booking questions, so.

13     Q.   Did Steven say why he was so concerned about what

14  he was being asked?

15     A.   No, but I didn't ask him why he was so concerned

16  about that.  You know, you and I, we and everybody in this

17  room, when we say routine booking questions, it's routine.

18  Routine to us; we know what they are.  For some people

19  they're not routine.  To some of my clients they are, some

20  of my clients who have been through this process a half

21  dozen times or more, it's not a big deal to them.  For

22  some people it is a big deal.  And for some people it is

23  intimidating and it can be frightening.  He was cuffed to

1   officer, I'm sorry, I'm drawing a blank now.  Officer, the
2   other officer in the booking room.

3       Q.  Tetreault?

4       A.  Right, Tetreault, Officer Tetreault said he had to
5   search me, and so he, you know, I stood up and he did the
6   search and then he asked me for my wallet.  He took my
7   belt and any personal effects, cell phone, whatever, a
8   pen, whatever I had on me besides my shirt and my suit
9   coat and my pants and my shoes.  I had loafers, so I
10  didn't have any laces.  I gave it to him and he put it in
11  a property bag and sealed it and I signed for it, and then
12  I was taken away.

13      Q.  And where were you taken to?

14      A.  I was taken to, I was taken out the side door to
15  the wagon with another prisoner, another defendant, and we
16  were transported to the lockup in the Third District
17  Court.  I was put into a cell in the Third District Court.

18      Q.  Was Furtado transported with you?

19      A.  No, he stayed behind.  That's why I called Kelly
20  to come to make sure that whoever came to pick him up had
21  some paperwork saying that they were authorized to do that
22  and also to make sure that they didn't keep him in the
23  police station past four o'clock because they just weren't

1    allowed to do that.  So she went to the New Bedford police

2    station and took care of him.

3        Q.   And do you know when he was picked up?

4        A.   He was, he was picked up -- I don't know, I don't

5    remember the exact time but it wasn't long after I left.

6        Q.   By the Navy?

7        A.   I don't know who picked him up.  I don't know who

8    the people were that picked him up.  I'm assuming it was

9    because he got to where, he spoke to someone because I

10   spoke to him a couple of days later and he told me what

11   had happened.

12       Q.   And he wasn't charged with any crime?

13       A.   By the New Bedford police or by the Navy?

14       Q.   By the New Bedford police.

15       A.   No, not, I don't know of any crime that he was

16   charged with.

17       Q.   So you're transported to the court and what

18   happens next?

19       A.   I'm downstairs in lockup with the other people

20   awaiting the, well, the two o'clock session was already in

21   session, so we were waiting to be brought upstairs and put

22   in the dock to be arraigned.

23       Q.   And were you arraigned that day?

1    Q.   Well, you were arraigned on the day, October 6,

2    2000?

3    A.   I was by Judge Turcotte.

4    Q.   By Judge Turcotte?

5    A.   Yes.

6    Q.   Were you released?

7    A.   Well, I was sent downstairs where everybody else

8    is given their property although they let me back upstairs

9    instead of out the garage door.

10   Q.   Okay, and then what happened?

11   A.   What did I do next?

12   Q.   Yes.

13   A.   I found my intern and called my wife, tracked down

14   my wife.

15   Q.   Okay.  And then what?

16   A.   I spoke to my wife and after that I called Kelly

17   Martin, spoke to her.

18   Q.   So what was the next event that happened related

19   to this case?

20   A.   I had a pretrial hearing.

21   Q.   When was that?

22   A.   Oh, I don't recall.  I'd have to look at the

23   docket sheets.

1    Q.  What happened at the pretrial?

2    A.  I think at this pretrial I think it was this

3  pretrial, I'm not sure if it was this day or the next day

4  but I was offered a remand to a PCA.  I accepted that.

5    Q.  And so what happened then?

6    A.  Oh, I'm sorry, it wasn't a PCA; it was a Show

7  Cause Hearing.

8    Q.  Okay, and then what happened?

9    A.  At the Show Cause Hearing?

10    Q.  So was that the next event, the Show Cause

11  Hearing?

12    A.  Yes, after I accepted the dismissal, the remand,

13  what happened is they dismissed the case and sent it to a

14  magistrate for a Show Cause Hearing.

15    Q.  And the magistrate conducted the Show Cause

16  Hearing?

17    A.  Yes.

18    Q.  And what happened there?

19    A.  The magistrate issued a complaint again, well, not

20  again, but he issued a complaint.

21    Q.  Now, were you represented by counsel?

22    A.  No.  Was I represented by counsel at the Show

23  Cause Hearing or at the first arraignment and pretrial?

1    charge?

2        A.   Dismissed.

3        Q.   And when was that?

4        A.   I don't remember offhand.  You'd have to, I'd have

5    to take a look at the docket sheets.

6        Q.   Do you know what stage of the proceedings it was?

7        A.   The pretrial.

8        Q.   Was it dismissed on any conditions?

9        A.   No conditions, no conditions, no costs, straight

10   dismissal.

11       Q.   And after the Show Cause Hearing, did you again

12   retain Attorney Harrington to represent you?

13       A.   No.

14       Q.   Were you represented by anyone at that point?

15       A.   Kevin Reddington.

16       Q.   Now, how much were you charged by Attorney

17   Harrington for his services?

18       A.   Nothing.

19       Q.   And how about Attorney Reddington?

20       A.   Kevin didn't charge me anything.

21       Q.   Have you lost any income as a result of the

22   incident on October 6, 2000?

23       A.   You know, that's so hard to say.  I don't know who

84

1   would have come to me that didn't come to me.  I don't

2   know who didn't refer somebody who might have referred

3   somebody.  I don't know.

4      Q.  Did you sustain any quantifiable damages?

5      A.  No -- I'm sorry, what do you mean by quantifiable

6   damages?

7      Q.  Can you give us a number on what if any damages

8   you sustained as a result of the actions in your

9   complaint?

10      A.  Do you mean in terms of monetary loss?

11      Q.  Yes.

12      A.  No, no, I can't.

13      Q.  Was there any monetary loss?

14      A.  Again, I don't know.  You know, lawyers live and

15   die by their reputation.  I don't know.  I don't know who

16   didn't come to me or who didn't refer somebody because of

17   this incident.

18      Q.  Do you believe that your reputation has been

19   diminished as a result of this incident?

20      A.  There are some who, I'm sure there are some who

21   would say yes and some who would say no.  I've had some

22   positive feedback and some not so positive feedback.

23      Q.  Has anyone told you that they wouldn't refer cases

1   to you because of this incident?

2       A.  No.  I have had people who have heard about it and

3   asked me to explain it.

4       Q.  Now, in August of 2003 you gave an interview with

5   Lawyers Weekly, is that correct?

6       A.  Sometime during that time period, yes.

7       Q.  I'm going to show you that document.

8               MR. CORBO:  Mark it for identification.

9               (Exhibit No. 1 marked.)

10      Q.  Mr. Brisson, I've just shown you a document

11  entitled "Up and coming lawyers 2003."  It says this

12  article appears in the Massachusetts Lawyers Weekly

13  Section B on August 25, 2003.  Are you familiar with this

14  article?

15      A.  I am.

16      Q.  Were you interviewed by the person who wrote the

17  article?

18      A.  I was.

19      Q.  And the article mentions the incident giving rise

20  to this litigation, is that correct?

21      A.  It does.

22      Q.  Did the interviewer know of the incident or did

23  you inform him of it?

```
                                        Volume:      1
                                        Pages:    1-12
                                        Exhibits:    0
```

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS.                    NEW BEDFORD DISTRICT COURT
                                DOCKET NO. 0033CR6590


* * * * * * * * * * * * * *  *
                              *
COMMONWEALTH OF MASSACHUSETTS, *
                              *
         VS                   *      DISPOSITION
                              *
STEVEN FURTADO,               *
                 Defendant.   *
                              *
* * * * * * * * * * * * * *  *


BEFORE:  The Honorable David T. Turcotte, J.

PLACE:   New Bedford District Courthouse
         75 North Sixth Street
         New Bedford, Massachusetts  02740

DATE:    October 6, 2000


*This transcript was prepared from District Court Tape Serial Numbers 162807, 1 through 1 in the above-captioned matter. We cannot guarantee a verbatim transcript from a court cassette copy. There may be parts of this transcript that reflect problems with audibility due to a poor recording.*

**********************

*CATHERINE ANN LABONTE, CVR-CM, MSE*
*Court Reporting Services*
*P.O. Box 832*
*Westport, Massachusetts  02790*
*(508) 673-7334*

LASER STOCK FORM B

THE CORBY GROUP  1-800-255-5040

2

## A P P E A R A N C E S

CHRISTOPHER SAUNDERS, Assistant District Attorney
**OFFICE OF THE DISTRICT ATTORNEY**
888 Pleasant Street
New Bedford, Massachusetts   02740

FOR: The Commonwealth

DONALD A. BRISSON, Esquire
P.O. Box 8186
18 South Water Street
New Bedford, Massachusetts   02740

FOR: The Defendant, Steven Furtado

LASER STOCK FORM B

THE CORBY GROUP  1-800-255-5040

3

<u>P R O C E E D I N G S</u>

[October 6, 2000]

1

2

3    THE CLERK:  Steven Furtado.  Attorney

4    Brisson, Your Honor, this is a case where he's

5    checking about -- Commonwealth, did he speak

6    with you about this one?

7    MR. SAUNDERS:  A little bit, Your

8    Honor.

9    THE CLERK:  Okay.  We're going to have

10    a second call because he's checking on a

11    warrant.  Have a seat, Mr. Furtado.  We'll call

12    it again.

13                    [Recess]

14    THE CLERK:  Attorney Brisson, are you

15    all set with Mr. Furtado?

16    MR. BRISSON:  (No audible response.)

17    THE CLERK:  Steven Furtado.

18    MR. BRISSON:  Judge, I represent Mr.

19    Furtado.  Mr. Furtado has a warrant for him from

20    the U.S. Navy.  I've been talking with the Jag

21    office in Newport.  I'm making arrangements for

22    them to come down here and pick him up on that

23    warrant.  Regarding the case that he was

24    arrested on here in New Bedford, Judge, I've

4

1  spoken with ADA Frank.  We have an agreed upon

2  disposition in that matter, Judge.  If I could

3  just get a second call, we could wrap that case

4  up here and take care of the federal warrant as

5  well today.

6         THE COURT:  What's he being held on,

7  this new case?

8         MR. BRISSON:  He's being held on the

9  warrant from the U.S. Navy, Judge.

10         THE COURT:  Okay, further call.

11         THE CLERK:  Further call.  Have a seat,

12  please.

13                [Recess]

14         THE CLERK:  Mr. Brisson, also

15  Lieutenant Borges informed me that he got a call

16  on Steven Furtado.  They are going to come and

17  pick him up today.  He's waiting to find out

18  what time.  Okay, so we'll call it again.

19                [Recess]

20         THE CLERK:  Steven Furtado.  Attorney

21  Brisson, please.

22         THE COURT:  Mr. Brisson, I have an

23  interesting question for you.

24         MR. BRISSON:  Yes, Judge.

1    THE COURT:  What's holding your client?

2    MR. BRISSON:  What's what?

3    THE COURT:  What's holding your client?

4    MR. BRISSON:  Judge, I believe he has a

5    warrant from the U.S. Navy.

6    THE COURT:  So what?

7    MR. BRISSON:  Right now ---

8    THE COURT:  So what?

9    MR. BRISSON:  You would let him go?

10   THE COURT:  I don't even know what that

11   means, do you?

12   MR. BRISSON:  No, Judge, absolutely

13   not.  We have a disposition in this matter,

14   Judge, for your consideration that's agreed

15   upon.  And then there should be nothing holding

16   him then.

17   MR. SAUNDERS:  Your Honor, if I may, on

18   that matter.  The Navy actually requested that

19   the defendant be held.  They have a warrant for

20   his arrest for his (inaudible) from the Navy.

21   They're coming to pick him up.  They're sending

22   someone over to pick him up today.

23   THE COURT:  What does that mean?  Think

24   about what you just said.  Who cares if the Navy

6

has something for anybody?  If I don't have a

warrant in the Commonwealth of Massachusetts,

which is answerable to our laws, then why am I

listening to the Navy saying hold somebody for?

Think of that.  Let's do this.  When are they

going to be here?

           MR. BRISSON:  Judge, I don't know.

           THE COURT:  See, if it's a real warrant

that's recognized under the law, there should be

a fugitive from justice complaint pending, which

there isn't.

           MR. BRISSON:  Right.  I just discovered

that, Judge.  There was no fugitive from

justice.

           THE COURT:  Dismissed, two hundred and

fifty dollars.

           MR. BRISSON:  Can we have three months

to pay that, Judge, please?

           THE COURT:  What's the purpose in that?

           MR. BRISSON:  Just to give him some

time to pay, Judge.

           THE COURT:  Well, if I hold him for ten

more minutes, the Navy's going to take him.

You're never going to see him.  He's going to be

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO 03-CV-12249-DPW

DONALD A. BRISSON,

    Plaintiff

v.

CITY OF NEW BEDFORD and NED K.
LEDUC,

    Defendants

AFFIDAVIT OF NED LEDUC

I, Ned K. LeDuc, do hereby depose and state as follows based on my own personal knowledge:

1.    On October 6, 2000, I was a Police Officer with the City of New Bedford Police Department (the "Department"). At the time of the incident giving rise to this complaint, I was an officer with the Department. I am currently retired.

2.    At approximately 1:30 p.m. on that date, I was on duty at the front desk of the police station at 871 Rockdale Avenue, New Bedford, Massachusetts (the "Station"). I was sitting at a desk adjacent to the entry area of the station. My position was separated from the entry area by a wall and a plexiglass window. At that time I was involved in an incident with the plaintiff, and, as a result of my involvement I authored two reports, true and accurate copies of which are attached hereto as Exhibits 1 and 2.

3.    As the desk officer, I was responsible for checking visitors into the station. Visitors were not permitted in any area beyond the entry area without approval from an officer of the Department. The entry area is separated from the remainder of the Station by a locked door. In my capacity as desk officer, if an individual wished to enter the Station, I would inquire as to the

purpose of their visit and contact the appropriate officer. I did not decide whether or not a particular visitor would be permitted to enter any other area of the Station.

4.     At approximately 1:30 p.m., Donald Brisson entered the entry area of the Station and approached my window. I did not know Mr. Brisson until he identified himself to me. I had never met or spoke with Mr. Brisson prior to that time.

5.     Upon entering the building, Mr. Brisson asked to speak with his client, whom he claimed was arrested by the New Bedford Police. I did not know who Mr. Brisson's client was or why he was at the police station. I was not involved in the arrest or booking of Mr. Brisson's client.

6.     In response to Mr. Brisson's inquiry, I contacted the sergeant in charge of booking, Sgt. Kristofer Winterson. At that time, there were numerous other civilians in the entry area of the Station and other officers working in my area.

7.     Sgt. Winterson met with Mr. Brisson, and I overheard him tell Mr. Brisson that he could not meet with his client. Mr. Brisson raised his voice at Sgt. Winterson several times.

8.     After meeting with Sgt. Winterson, Mr. Brisson, in a raised voice, continued to ask me if he could meet with his client. Mr. Brisson was loud, abusive and yelling, and I could not conduct official police business with Mr. Brisson behaving in that manner. Specifically, Mr. Brisson's disruptive behavior prevented me from addressing the needs of the other civilians in the entry area at the time, from completing paper work and from answering the phones.

9.     Mr. Brisson persisted and refused to back away from the glass after being asked to do so by Officer Claudia Sampson. At that point, I entered the entry area and told Mr. Brisson to leave the Station or he would be arrested for trespass. Mr. Brisson refused and I again told him to leave or he would be arrested.

2

10.     Mr. Brisson again refused to leave and I placed him under arrest through verbal order. I did not use any force in arresting Mr. Brisson and did not handcuff him.

11.     At all times during this incident, I was acting good faith in the performance of my duties as a police officer for the City of New Bedford. As I had never met Mr. Brisson or his client, who I later learned was identified as Steven Furtado, I harbored no animus or ill will towards them, and had nothing to gain by preventing them from meeting.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 2 DAY OF FEBRUARY, 2005.

Ned K LeDuc
City of New Bedford Police Department
(Retired)

244297/60700/0499

3

**14:44:11** 10-06-00

REPORTS NO. 00-19573

NEW BEDFORD POLICE DEPT INCIDENT REPORT
```
----------------------------------------------------
    DATE OF INCIDENT: 10/06/00
    TIME OF INCIDENT: 13:30
    HATE CRIME Y/N  : N
    ABUSE Y/N       : N
    GANG RELATED Y/N: N
    TYPE COMPLAINT  : PO   POLICE COMPLAINT
    2ND DISP CODE   : 5707 TRESPASSING
    REPORTED DATE   : 10/06/00
    REPORTED TIME   : 13:45
    LOCATION OF INC : 871 ROCKDALE AVE
    DEFENDANT INFO #: 01
```

NEW BEDFORD POLICE DEPT INCIDENT REPORT
```
----------------------------------------------------
    INV.OFC.NARR (Y):
        SIR: THIS OFFICER AFTER BEING YELLED AT IN A LOUD TONE, TOLD HE
        DEFENDANT TO LEAVE THE POLICE STATION, HE REFUSED AND HE WAS PLACED
        UNDER ARREST FOR THE CHARGE BELOW....

            OFFICER C. SAMPSON WAS PRESENT  WHEN THE INCIDENT OCURRED.

        WHEN THE DEFENDANT ENTEREDTHE BUILDING, HE WAS VERY LOUD,
        SPEAKING WITH SGT. WINTERSON, HE ASKED THIS OFFICER MANY TIMES
        ABOUT SPEAKING TO HIS CLIENT THAT WAS IN THE BOOKING ROOM AFTER
        SGT. WINTERSON REFUSED HIM. MR. BRISSON RAISEDTHIS VOICE TO THIS
        OFFICER. HE REFUSED TO STEP BACK FROM THE WINDOW AFTER OFF. C.
        SAMPSON TOL HIM TO. I TOLD HIM TO STEP BACK, HE REFUSED. I WENT
        INTO THE LOBBY AND TOLD HIM TO LEAVE THE BUILDING. I TOLD HIM
        TWICE TO LEAVE THE AREA, HE REFUSED ALL TIMES. I PLACED HIM UNDER
        ARREST.

        I COULD NOT CONDUCT OFFICIAL POLICE BUSINESS WITH BRISSON IN THE
        LOBBY ACTING IN THAT MANNER.\
    INVEST. OFC#     : 3309 LEDUC, NED K
    DIVISION NUMBER : 1    HEADQUARTERS
    COMMANDING OFC# : 3138 NETINHO, RICHARD
```

```
DEFENDANT INFO SUB-SCREEN            VAL: 1
----------------------------------------------------
    PERSON TYPE    : D   DEFENDANT
    DEF. MNI NO.   : 002539
    FIRST NAME     : DONALD
    MIDDLE NAME    : A
    LAST NAME      : BRISSON
    ADDRESS        : 5 KNOLLWOOD DR.
    CITY           : NO. DARTMOUTH
    STATE          : MA
    ZIP CODE       : 02747
    D.O.B.         : 01/28/61
    SSN#           : 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
```

A True Copy
Attest:

Asst. Clerk Magistrate

14:44:11 10-06-00

REPORTS NO. 00-19573

```
DEFENDANT'S SEX  : M    MALE
DEFENDANT'S RACE : W    WHITE
OFFENSE          : TESPASING
ARRESTED?        : Y
```

A True Copy
Attest:

Asst. Clerk Magistrate

# NEW BEDFORD POLICE DEPARTMENT 2000-19573

871 Rockdale Avenue
REPORT

---

NO OFFENSES ASSOCIATED TO THIS REPORT

# of Offenses: 0

---

NO BUSINESS OR ORGANIZATION ASSOCIATED TO THIS REPORT

---

## PERSONS

```
Person Type: ARRESTED OR SUMMONED   Type Booking:                Seq#:
MNI#: 002539  DOB: 01/28/1961  AGE:       SSN: 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
Name: BRISSON, DONALD A            Race: WHITE Sex: M
Address: 5 KNOLLWOOD DR.           Apt:       City: NO. DARTMOUTH
State: MASSACHUSETTS    Zip: 02747            Home Phone:
Employer:                                     Work Phone:
Occupation: STUDENT
ID Type:                    Number:                     From:
Hgt:      Wgt:     Eye Color:        Build:             Skin:
Hair:               Length:          Style:
Clothing:
Words:
Actions:
Short Synopsis:
Statement:
```

---

THERE ARE NO OTHER POLICE OFFICER WITNESSES

---

NO ARRESTS ASSOCIATED TO THIS REPORT

---

NO CITATIONS ASSOCIATED TO THIS REPORT

NEW BEDFORD POLICE DEPARTMENT

2000-19573

PAGE 2

NO TOWS ASSOCIATED WITH THIS REPORT.

NO PROPERTY ASSOCIATED TO THIS REPORT

Total Property Value Stolen:  $      0  Recovered: $          0

## PHOTOS AND FINGERPRINTS

Processed:     By:                        Photos:     Prints:

## NARRATIVE

SIR: THIS OFFICER AFTER BEING YELLED AT IN A LOUD TONE, TOLD THE DEFENDANT T
O LEAVE THE POLICE STATION, HE REFUSED AND HE WAS PLACED UNDER ARREST FOR THE C
HARGE BELOW.... - OFFICER C. SAMPSON WAS PRESENT WHEN THE INCIDENT OCURRED. - W
HEN THE DEFENDANT ENTERED THE BUILDING,HE WAS VERY LOUD, SPEAKING WITH SGT. WIN
TERSON, HE ASKED THIS OFFICER MANY TIMES ABOUT SPEAKING TO HIS CLIENT THAT WAS
IN THE BOOKING ROOM AFTER SGT. WINTERSON REFUSED HIM. MR. BRISSON RAISED HIS VO
ICE TO THIS OFFICER. HE REFUSED TO STEP BACK FROM THE WINDOW AFTER OFF. C. SAMP
SON TOLD HIM TO.I TOLD HIM TO STEP BACK, HE REFUSED. I WENT INTO THE LOBBY AND
TOLD HIM TO LEAVE THE BUILDING. I TOLD HIM TWICE TO LEAVE THE AREA, HE REFUSED
ALL TIMES. I PLACED HIM UNDER ARREST. - I COULD NOT CONDUCT OFFICIAL POLICE BUS
INESS WITH BRISSON IN THE LOBBY ACTING IN THAT MANNER. SGT. MARK STONE WAS A WI
TNESS TO THE ARREST AS HE WAS IN THE RECORD ROOM AT THAT IME. - MR. BRISSON WAS
 AT THE STATION WANTING TO SEE A CLIENT THAT WAS BEING HELD ON A FEDERAL WARRAN
T FROM THE U.S.NAVY. THE CONTROL# IS W770008236....THE WARRANT IS FOR A STEVEN
FURTADO DOB/ 3/1/78, OF 115 GRINNELL ST. NB. - ATTACHED IS A COPY OF THE WARRAN
T AND THE OFFICERS THAT PICKED UP THE DEFENDANT..

## ADMINISTRATION

Electronic Signature by Logon:
Report Entered by Officer: **LEDUC, NED K**
Unit OFC1:                           #:     Unit:     Date:
Unit OFC2:                           #:     Unit:
Routing:              Att:        Date:                    Div:
Clearance  :                 Clearance Date:
Supervisor : **NETINHO, RICHARD**        #: 3138
Approved By: **NETINHO, RICHARD**        #: 3138
Attachments:
Digtal Photos Attached: