# EXHIBIT "A"

# APPLICATION FOR COMPLAINT

NUMBER

☑ ADULT    ☐ JUVENILE

**Trial Court of Massachusetts**
**District Court Department**
COURT DIVISION

☑ ARREST    ☐ HEARING    ☐ SUMMONS    ☐ WARRANT
THE WITHIN NAMED COMPLAINANT REQUESTS THAT A COMPLAINT ISSUE AGAINST THE WITHIN NAMED
DEFENDENT, CHARGING SAID DEFENDANT WITH THE OFFENSE(S) LISTED BELOW.

Third District Court
75 N. Sixth Street
New Bedford, MA 02740
REPORT # 00-19573

| DATE OF APPLICATION | DATE OF OFFENSE | PLACE OF OFFENSE |
|---|---|---|
| 10/06/00 | 10/06/00 | 871 OCKDALE AVE |

NAME OF COMPLAINANT
3309 LEDUC, NED K

ADDRESS AND ZIP CODE OF COMPLAINANT

New Bedford Police Department
871 Rockdale Avenue
New Bedford, MA 02740

| NO. | OFFENSE | | G.L. AND SEC. |
|---|---|---|---|
| 1. | TRESPASSING Court Code: | CH: SEC: | 266 120 |
| 2. | Court Code: | CH: SEC: | |
| 3. | Court Code: | SEC: | L |
| 4. | Court Code: | CH: SEC: | ~ |

NAME, ADDRESS, AND ZIP CODE OF DEFENDANT
DONALD    A    BRISSON

5 KNOLLWOOD DR.

NO. DARTMOUTH        MA    02747

OK TUA

A hearing upon this complaint application will be held at the above court address on

| DATE OF HEARING | | TIME OF HEARING |
|---|---|---|
| | AT | |

## CASE PARTICULARS — BE SPECIFIC

| No. | NAME OF VICTIM Owner of property, person assaulted, etc. | DESCRIPTION OF PROPERTY Goods stolen, what destroyed, etc. | VALUE OF PROPERTY Over or under $250 | TYPE OF CONTROLLED SUBSTANCE OR WEAPON Marijuana, gun, etc. |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |

OTHER REMARKS
SIR: THIS OFICER TOLD THE DEFENDANTTO LEAVE THE POLICE STATION, HE
REFUSED, AND HE WAS PLACED UNDER ARREST.

x _____
SIGNATURE OF COMPLAINANT

## DEFENDANT IDENTIFICATION INFORMATION — Complete data below if known.

| DATE OF BIRTH | PLACE OF BIRTH | SOC. SECURITY NO. | Sex | Race | HEIGHT | WEIGHT | EYES | HAIR |
|---|---|---|---|---|---|---|---|---|
| 01/28/61 | MASSACHUSETTS | 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 | M | W | 511 | 225 | BLU | BLO |

| OCCUPATION | EMPLOYER/SCHOOL | MOTHER'S NAME (MAIDEN) | FATHER'S NAME |
|---|---|---|---|
| LAWYER | SELF EMPLOYED | | |

| DATE | DISPOSITION | AUTHORIZED BY |
|---|---|---|

NO PROCESS TO ISSUE
☐ At request of complainant
☐ Complainant failed to prosecute
☐ Insufficient evidence having been presented

PROCESS TO ISSUE
☐ Sufficient evidence presented
☐ Defendant failed to appear

TYPE OF PROCESS
☐ Warrant
☐ Summons returnable

A True Copy. Attest: Ass't Clerk Magistrate

☐ Continued to

COMMENTS

DC-CR2 (5/89)

COURT COPY

# EXHIBIT "B"

Westlaw.

M.G.L.A. 266 § 120

C
Massachusetts General Laws Annotated Currentness
  Part IV. Crimes, Punishments and Proceedings in Criminal Cases
    Title I. Crimes and Punishments
      Chapter 266. Crimes Against Property (Refs & Annos)

+++ CURRENT VERSION +++

VIEW ALL VERSIONS

→§ 120. Entry upon private property after being forbidden as trespass; prima facie evidence; penalties; arrest; tenants or occupants excepted

Whoever, without right enters or remains in or upon the dwelling house, buildings, boats or improved or enclosed land, wharf, or pier of another, or enters or remains in a school bus, as defined in section 1 of chapter 90, after having been forbidden so to do by the person who has lawful control of said premises, whether directly or by notice posted thereon, or in violation of a court order pursuant to section thirty-four B of chapter two hundred and eight or section three or four of chapter two hundred and nine A, shall be punished by a fine of not more than one hundred dollars or by imprisonment for not more than thirty days or both such fine and imprisonment. Proof that a court has given notice of such a court order to the alleged offender shall be prima facie evidence that the notice requirement of this section has been met. A person who is found committing such trespass may be arrested by a sheriff, deputy sheriff, constable or police officer and kept in custody in a convenient place, not more than twenty-four hours, Sunday excepted, until a complaint can be made against him for the offence, and he be taken upon a warrant issued upon such complaint.

This section shall not apply to tenants or occupants of residential premises who, having rightfully entered said premises at the commencement of the tenancy or occupancy, remain therein after such tenancy or occupancy has been or is alleged to have been terminated. The owner or landlord of said premises may recover possession thereof only through appropriate civil proceedings.

CREDIT(S)

Amended by St.1969, c. 463, § 2; St.1974, c. 109; St.1978, c. 447, § 3; St.1983, c. 678, § 6; St.1999, c. 102.

HISTORICAL AND STATUTORY NOTES

2000 Main Volume

St.1862, c. 89.
St.1876, c. 181.
P.S.1882, c. 203, §§ 99, 100.
St.1890, c. 410.
R.L.1902, c. 208, § 109.
St.1929, c. 109.
St.1931, c. 426, § 45.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT "C"

MJI MA-CLE S-5.30-1
(Handbook Supplement)

5.34 TRESPASS

**The defendant is charged with trespass. Section 120 of chapter 266** of our General Laws provides as follows:

"Whoever, **without right enters or remains in or upon the (dwelling house)** (buildings) (boats) (improved or enclosed land) ... of another, after having been forbidden to do so by the person who has lawful control of [the] premises, whether directly or by notice posted thereon, ... shall be punished."

**In order to prove the defendant guilty of trespass, the Commonwealth must** prove two things beyond a reasonable doubt:

First: **That, without right, the defendant entered or remained (in a dwelling** house) (in a building) (on a boat) (on improved or enclosed land) of another; and

Second: **That the defendant was forbidden both to enter or to remain there by** the person in lawful control of the premises, either directly or by means of a posted notice.

Commonwealth v. Richardson, 313 Mass. 632, 637, 48 N.E.2d 678, 682 (1943) (the two forbidden acts are phrased disjunctively); Commonwealth v. Einarson, 6 Mass. App. Ct. 835, 372 N.E.2d 278, 279 (1978) (municipal ordinance or regulation forbidding trespass after dark must be introduced in evidence).

**The first requirement is satisfied by proof that the defendant either entered** on the premises without permission, or failed to leave after being requested to do so.

If there was a posted notice. **To satisfy the second element, the Commonwealth** is not required to prove that the defendant actually saw a notice forbidding **trespassing.** The Commonwealth is only required to prove that there was a reasonably distinct notice forbidding trespass, and that it was posted in a reasonably suitable place so that a reasonably careful trespasser would see it.

Fitzgerald v. Lewis, 164 Mass. 495, 500-501, 41 N.E. 687, 688 (1895) (notice need not be signed or indicate the basis of its authority).

If there was no posted notice. **To satisfy the second element by proving that** the owner "directly" forbade entry to the defendant, the law does not require a person having control of unposted premises to be on the premises at all times of the day or night to personally warn off intruders. Such a person may also bar entry by securing the premises with secure fences or walls and with locked gates or doors, and this is considered to be "directly" forbidding entry to the premises.

Commonwealth v. A Juvenile (No. 1), 6 Mass. App. Ct. 106, 108, 373 N.E.2d 1202, 1204 (1978).

NOTES:

1. **"Another's" property.** Evidence supporting an inference that the property did not belong to the defendant is sufficient to establish that the property belonged to another. Commonwealth v. Averill, 12 Mass. App. Ct. 260, 263, 423 N.E.2d 6, 8 (1981).

2. **Claim of right.** "A claim of ownership is not a defense to a criminal trespass complaint; it is enough to show that the entry or remaining was 'without right.'" Commonwealth v. Fenton, 24 Mass. App. Ct. 1109, 509 N.E.2d 1224(1987) (unpublished opinion under Appeals Court Rule 1:28). [Such unpublished opinions have no precedential value in other cases. Lyons v. Labor Relations Comm'n, 19 Mass. App. Ct. 562, 566 & n.7, 476 N.E.2d 243, 246 & n.7 (1985), rev'd on other grounds, 397 Mass. 498, 492 N.E.2d 343 (1986).] See Fitzgerald, supra.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

MJI MA-CLE S-5.30-1
(Handbook Supplement)

3. **External deck, porch, steps.** An external deck or porch, or steps leading to the front door, are properly regarded as part of a building for purposes of the trespass statute. Commonwealth v. Wolf, 34 Mass. App. Ct. 949, 949, 614 N.E.2d 679, 680 (1993).

4. **Holdover tenants.** A trespass charge may not be brought against holdover tenants; instead the owner must resort to civil proceedings. G.L. c. 266, § 120. As to a foreclosing mortgagee's rights, see Attorney General v. Dime Savings Bank of New York, FSB, 413 Mass. 284, 596 N.E.2d 1013 (1992).

5. **Implied license.** Under some circumstances, a person may be privileged to enter onto another's property to determine whether the person in control wishes to deal with him, and for passage off upon receiving a negative answer. See Commonwealth v. Hood, 389 Mass. 581, 589-590, 452 N.E.2d 188, 193-194 (1983); Commonwealth v. Krasner, 360 Mass. 848, 848, 274 N.E.2d 347, 348 (1971) (such implied license may extend to some parts of property but not others); Richardson, 313 Mass. at 638-641, 48 N.E.2d at 682-683.

6. **Public property.** General Laws c. 266, § 120 may be applied to state or municipal property as well as to privately owned property. Commonwealth v. Egleson, 355 Mass. 259, 262, 244 N.E.2d 589, 591-592 (1969). The model instruction may be adapted for a complaint brought under G.L. c. 266, § 123 (trespass on certain public property).

7. **Related statutes.** See also G.L. c. 266, §§ 121 (trespass with firearms), 121A (trespass with vehicle), 120A (owner of **trespassing** parked vehicle is prima facie the trespasser), 120D (disposal of **trespassing** parked vehicle), 120B (abutter's privilege), 120C (surveyor's privilege). Trespass is not a lesser included offense of breaking and entering. Commonwealth v. Vinnicombe, 28 Mass. App. Ct. 934, 549 N.E.2d 1137 (1990).

# EXHIBIT "D"

# New Bedford Police Department
# Division of Professional Standards

## Investigation of Complaint
## made by
## Donald A. Brisson, Esquire

### Case Number: 1141

### Transcript of Interview of:
### Officer Ned LeDuc

### June 24, 2003

### Interview Conducted by:
### Detective Lieutenant Manuel Ortega

### Assisted by:
### Sergeant Troy Spellette

Transcriber
Joyce L. Reed
Post Office Box 222
West Wareham, MA 02576
Phone: 508-295-4366
eMail: jaytaper@aol.com

# DISCLAIMER

To allow ease of quoting and reading aloud from the transcript, utterances such as "uh," "uhm", and repetitive speech, stuttering, and the like, are not included in the transcription. Vernacular such as "gonna", "cuz", etc., is reflected herein in its proper form, "gonna", for example, will be transcribed as "going to", and so on.

Utterances such as "uh-huh" and "uh-uh", depending on whether spoken in affirmative or negative tones, are followed by the appropriate word — "yes" or "no" — encased in brackets depicting their meanings. For example if the speaker utters a non-word such as "Mm-hmm" in an affirmative tone it will be followed by the word "yes" encased in brackets and will appear as "Mm-hmm. [yes]", in the transcript.

... Interrupted speech, unfinished sentences, or lengthy pauses are designated by three (3) dots [periods] where the interruption occurs. Resumption of interrupted speech is also indicated by three dots.

[####] A three or four digit number encased in brackets identifies a point on the audio tape where inaudible or indiscernible words were spoken or some sort of irregularity occurred on the audio tape. Searches - by number — can vary significantly as a result of rewinding.

[ ] Brackets are also used to designate transcriber comments. For example the words "END OF SIDE ONE; TAPE ONE", "SIDEBAR", etc., are shown in brackets as they are transcriber comments and not part of the actual litigation audio record.

Donald A. Brisson, Esquire - Page 2 of 10

**Cassette # 1 - Side # 1**

Officer Ned LeDuc, first having been duly sworn, gave the following statement:

ORTEGA:       For the record, today's date is June twenty-fourth. The time is approximately ten, thirty-five. This is an Administrative Interview, taking place in the Division of Professional Standards of the New Bedford Police Department. The case number is Eleven, forty-one. The lead interviewer is myself, Lieutenant Manuel Ortega. I am being assisted by Sergeant Troy Spellette. The subject of the interview is Retired Officer Ned LeDuc or Mister LeDuc. Could you give me your name and I guess your present address now and your telephone number.

LeDUC:        Ned LeDuc, five, seventy-eight Elm Street, South Dartmouth, nine, nine, three, five, four, eight, two.

ORTEGA:       Okay. On October sixth of two-thousand, our records indicate that you were working back then on B shift. Is that correct?

LeDUC:        I was.

ORTEGA:       Okay. At approximately one, thirty, P.M., you had a, an incident occurred at headquarters that you

Donald A. Brisson, Esquire - Page 3 of 10

1             were involved in with an attorney, Donald Brisson.

2             You want to tell us what happened that afternoon?

3 LeDUC:       Mister Brisson came in to headquarters requesting

4             to speak to his client.  Sergeant Winterson, who

5             was the Sergeant of Patrol Booking, told Mister

6             Brisson that he could not, to the best of my

7             recollection.  Mister Brisson raised his voice

8             numerous times at Sergeant Winterson.  Sergeant

9             Winterson, I believe asked him to leave the

10            building.  He did not.  Officer Sampson, Claudia

11            Sampson, was in the headquarters area with me at

12            the time.  We were behind the window at the

13            headquarters desk. Claudia Sampson asked Mister

14            Brisson to step back from the window at the main

15            desk numerous times.  He did not.  We could not

16            conduct our business within the headquarters area

17            with him there.  He was very loud, abusive,

18            yelling.  I then approached Mister Brisson through

19            the window, to please step back from the window.

20            He refused.  I then went around through the door,

21            the locked door, into the waiting area.  I asked

22            him again to please be quiet, to step back.  He

23            refused.  I asked him to leave the building.  He

Donald A. Brisson, Esquire - Page 4 of 10

1               refused.  At that time he was placed under arrest.

2

3 ORTEGA:       Okay.  When he first came in to the building to

4               inquire about his client, to speak his client, you

5               had a conversation with him, yourself with him at

6               that point?

7 LeDUC:        I don't think I did.  No. I don't think I did.  I

8               think Sergeant Winterson ....  I think I ....  He

9               may have approached the window.  I believe I was

10              the desk officer at the time.

11 ORTEGA:      Okay.

12 LeDUC:       He may have approached the window.  I don't really

13              recall but I remember Sergeant Winterson coming up

14              from the rear booking area and talking to Mister

15              Brisson.

16 ORTEGA:      How did Sergeant Winterson ....  How did he get

17              notified that the individual was there?

18 LeDUC:       Again, I am not ....  I don't recall.  I have to

19              assume that either I or Claudia Sampson, Officer

20              Sampson, called back to the booking area and asked

21              Mister, Sergeant Winterson to come forward.

22 ORTEGA:      The conversation that affected him and his client,

23              the attorney and his client, occurred or started

Donald A. Brisson, Esquire - Page 5 of 10

1          after Sergeant Winterson came to the front desk?

2          There was no conversation about the attorney, about

3          him wanting to see his client or anything with you

4          or with Officer Sampson?

5 LeDUC:   Not that I recall.    Everything ....    The

6          conversation with Sergeant Winterson and Mister

7          Brisson occurred when Sergeant Winterson came

8          forward.    I believe everything happened in the

9          waiting area, the civilian waiting area.

10 ORTEGA:  I guess I will ask ....    The safe assumption is

11          probably that he came in, said that he wanted to

12          speak to someone concerning his client that was in

13          back being booked.    So you called or someone

14          called.    Sergeant Winterson reports to the front

15          lobby area, has this conversation with the

16          attorney.    Well, we're only booking him and so

17          forth and he is not going to ....    He is not being

18          questioned.    And then he becomes loud.    He insists

19          on that he wants to see his client and he is told

20          that he is not going to be able to.    There is no

21          place back there for that.    Then he is told to

22          leave and he refuses and gets placed under arrest.

23 LeDUC:   That is a good assumption.    The only thing ...    The

Donald A. Brisson, Esquire - Page 6 of 10

1    thing I remember also is after Sergeant Winterson

2    told him numerous times to be quiet, leave the area

3    , Sergeant Winterson just turned around and walked

4    back through the locked door.  So he was in back of

5    that locked door and Mister Brisson was still in

6    the waiting area creating a disturbance.  So

7    Sergeant Winterson was behind the door and Mister

8    Brisson was in front of the door.

9    ORTEGA:        That's when you went out?

10   LeDUC:         That's when I went out.  After he didn't ....  He

11                  would not step back from the window and he would

12                  not be quiet.

13   ORTEGA:        Were there other people there that were coming in

14                  to do police business, civilians that were coming

15                  in to do ....

16   LeDUC:         Yes.  There were three or four other people within

17                  the lobby area.  I don't believe they were

18                  connected with Mister Brisson either.  They were

19                  different and apart from him.  Whether it would be

20                  the Record Room or the main desk, I am not sure

21                  what the other business was at the time.

22   ORTEGA:        So his actions were causing you guys to have a

23                  difficult time dealing with other folks or ....

Donald A. Brisson, Esquire - Page 7 of 10

1 LeDUC:          We couldn't do it.  We couldn't do it with him

2                 there.   We could not conduct business with him

3                 there.

4 ORTEGA:         How many times do you think he was warned to either

5                 quiet down, leave or he would be placed under

6                 arrest?

7 LeDUC:          Well, I warned him three or four times.  Officer

8                 Sampson warned him at least twice and Sergeant

9                 Winterson warned him at least twice.

10 ORTEGA:        Once he was arrested, how was ....., did his

11                demeanor change at all?

12 LeDUC:         Mister Brisson was a perfect gentleman.  After he

13                was arrested, I took him through the door, put

14                cuffs on him.  He was a perfect gentleman.

15                Everything I asked of him, he did.  He was in the

16                back in the booking area.  He was a perfect

17                gentleman.  Took off his belt for us.  Didn't raise

18                his voice at all.  Perfect gentleman.

19 ORTEGA:        Okay [0171].  He had a chance to see his client at

20                that point?

21 LeDUC:         I am not aware of that.  I don't recall if his

22                client was still there or had already been

23                transported to District Court.  I just can't recall

Donald A. Brisson, Esquire - Page 8 of 10

```
1                    that.

2 ORTEGA:            So there was no resistance on his part?

3 LeDUC:             Perfect gentleman.

4 ORTEGA:            Never made any complaints or ....

5 LeDUC:             Never.

6 ORTEGA:            .... to you or to anyone else that was there in

7                    your presence ....

8 LeDUC:             Not that I am aware of.

9 ORTEGA:            .... about how he was being treated or ....

10 LeDUC:            Not that I am aware of.

11 ORTEGA:           Do you have any questions?

12 SPELLETTE:        No.  I don't.

13 ORTEGA:           Okay. [0180].  That concludes the interview.
```

**CERTIFICATE OF ACCURACY**

February 3, 2005

I hereby certify the preceding pages truly and accurately, to the best of my ability, represent designated portions of an audio-cassette pertaining to an Interview of Officer Ned LeDuc in the matter of Donald A. Brisson and the New Bedford Police Department, Division of Professional Standards, Case Number 1141, held at the New Bedford Police Department on June 24, 2003.

*Joyce L. Reed*

Joyce L. Reed

Transcriber

# EXHIBIT "E"

# New Bedford Police Department
# Division of Professional Standards

## Investigation of Complaint made by
## Donald A. Brisson, Esquire

### Case Number: 1141

### Transcript of Interview of:
### Officer Claudia Sampson

### June 24, 2003

### Interview Conducted by:
### Detective Lieutenant Manuel Ortega

### Assisted by:
### Sergeant Troy Spellette

Transcriber
Joyce L. Reed
Post Office Box 222
West Wareham, MA 02576
Phone: 508-295-4366
eMail: jaytaper@aol.com

# DISCLAIMER

To allow ease of quoting and reading aloud from the transcript, utterances such as "uh," "uhm", and repetitive speech, stuttering, and the like, are not included in the transcription. Vernacular such as "gonna", "cuz", etc., is reflected herein in its proper form, "gonna", for example, will be transcribed as "going to", and so on.

Utterances such as "uh-huh" and "uh-uh", depending on whether spoken in affirmative or negative tones, are followed by the appropriate word — "yes" or "no" — encased in brackets depicting their meanings. For example if the speaker utters a non-word such as "Mm-hmm" in an affirmative tone it will be followed by the word "yes" encased in brackets and will appear as "Mm-hmm. [yes]", in the transcript.

... Interrupted speech, unfinished sentences, or lengthy pauses are designated by three (3) dots [periods] where the interruption occurs. Resumption of interrupted speech is also indicated by three dots.

[####] A three or four digit number encased in brackets identifies a point on the audio tape where inaudible or indiscernible words were spoken or some sort of irregularity occurred on the audio tape. Searches - by number - can vary significantly as a result of rewinding.

[   ] Brackets are also used to designate transcriber comments. For example the words "END OF SIDE ONE; TAPE ONE", "SIDEBAR", etc., are shown in brackets as they are transcriber comments and not part of the actual litigation audio record.

Donald A. Brisson, Esquire - Page 2 of 9

1
2                        Cassette  #1 Side #1

3  Officer Claudia Sampson, first having been duly sworn, gave the

4  following statement:

5  ORTEGA:          Okay, for the record, today's date is June twenty-
6                   fourth.  The time is approximately ten, ten, oh,
7                   five A. M.   This is an Administrative Interview,
8                   taking place in the Division of Professional
9                   Standards of the New Bedford Police Department.
10                  The case number is Eleven, forty-one.  The lead off
11                  interviewer is myself, Lieutenant Ortega.   I am
12                  being assisted by Sergeant Troy Spellette.   The
13                  subject of the interview is Officer Claudia
14                  Sampson.   For the record, could you state your
15                  name, rank and your present assignment.

16 SAMPSON:         I am Claudia Sampson and I am in the I - D Unit,
17                  Patrolman.

18 ORTEGA:          Okay.  On the day shift, right?

19 SAMPSON:         Day shift.  Yes.

20 ORTEGA:          Okay.  On October sixth, two-thousand, two ....  So
21                  it does go back a little bit.  Our records indicate
22                  that you were assigned to B Shift.   Is that
23                  correct?

24 SAMPSON:         Yes.  I was.

                Donald A. Brisson, Esquire - Page 3 of 9

| | |
|---|---|
| 1 ORTEGA: | Okay.   At approximately  one,  thirty P. M., a |
| 2 | retired officer, Ned LeDuc arrested Attorney Donald |
| 3 | Brisson for Trespass After Notice, which is the |
| 4 | charge that he has been up with.  Can you describe, |
| 5 | if you recall, what happened between, right before |
| 6 | the arrest? |
| 7 SAMPSON: | I was standing at the desk and Attorney Brisson |
| 8 | came in and he wanted to speak to his client, who |
| 9 | was under arrest for some military charge.  And he |
| 10 | was told that they had to wait for a supervisor to |
| 11 | see if they could make arrangements for him to go |
| 12 | back there.  And he kept on insisting that we were |
| 13 | questioning him, his client, and the only questions |
| 14 | that, it was explained to him, that they were |
| 15 | booking questions, the standard booking questions. |
| 16 | And he became irate and he just kept going on and |
| 17 | on and on, causing a disturbance in the lobby.  And |
| 18 | he was asked to leave the building.  He refused to |
| 19 | leave the building.  And he gave Ned LeDuc a hard |
| 20 | time.  At that point he was asked one more time to |
| 21 | leave.  He refused to leave and he was placed under |
| 22 | arrest. |
| 23 ORTEGA: | Okay.  How many times would you say Officer LeDuc |

Donald A. Brisson, Esquire - Page 4 of 9

| | | |
|---|---|---|
| 1 | | warned him about calm down, leave the building? |
| 2 | SAMPSON: | I don't know how many times but he told him several |
| 3 | | times that what was going on.  And that he had to |
| 4 | | calm down.  There were other people coming in.  And |
| 5 | | he just refused.  He was getting nasty actually. |
| 6 | | He wouldn't ...   Officer LeDuc .... |
| 7 | ORTEGA: | So when this conversation was taking place it was |
| 8 | | between you and Ned and the attorney or were you |
| 9 | | part of the conversation?  Were you giving him ... |
| 10 | SAMPSON: | Yes.  I tried to ....   I even went out in the hall |
| 11 | | and tried to explain to him the booking questions, |
| 12 | | that they are standard booking questions, asked of |
| 13 | | everybody that comes in.  And it is not an attorney |
| 14 | | , client type of question.  It is .... |
| 15 | ORTEGA: | Right. |
| 16 | SAMPSON: | It is standard. |
| 17 | ORTEGA: | Okay.  So you were, you went .... |
| 18 | SAMPSON: | He didn't want to hear it. |
| 19 | ORTEGA: | Okay.  So you went to the hall and you had a |
| 20 | | conversation.  Ned is still behind .... |
| 21 | SAMPSON: | Yes.  Ned is, yes, at the window. |
| 22 | ORTEGA: | At the window. |
| 23 | SAMPSON: | And I opened the door because you can't hear real |

Donald A. Brisson, Esquire - Page 5 of 9

| | | |
|---|---|---|
| 1 | | good.  And we tried to explain to him but he was |
| 2 | | very nasty and belligerent. |
| 3 | ORTEGA: | Okay.  At one time did Ned leave his, his, the desk |
| 4 | | and go in to the hallway? |
| 5 | SAMPSON: | Yes.  He did. |
| 6 | ORTEGA: | Okay and what happened when he .... |
| 7 | SAMPSON: | He talked to him a little bit.  He told him he |
| 8 | | wanted him to leave the building.  He was told a |
| 9 | | couple times to leave the building and he refused. |
| 10 | | And he was placed under arrest. |
| 11 | ORTEGA: | Okay.  When he was placed under arrest, was there |
| 12 | | any  resistance  on  the  individual's  part  or |
| 13 | | anything?  Did he just comply? |
| 14 | SAMPSON: | No.  He was just mouthy. |
| 15 | ORTEGA: | Just complied. |
| 16 | SAMPSON: | Very mouthy. |
| 17 | ORTEGA: | All right. |
| 18 | SAMPSON: | Other than that, he came right in. |
| 19 | ORTEGA: | So physically, he didn't resist or .... |
| 20 | SAMPSON: | Not that I remember.  No. |
| 21 | ORTEGA: | Okay.  Thinking back now, do you think the |
| 22 | | situation could have been handled differently based |
| 23 | | on retrospect now? |

Donald A. Brisson, Esquire - Page 6 of 9

| | | |
|---|---|---|
| 1 | SAMPSON: | No.  He was just ....  He wasn't having any part of |
| 2 | | it.  He was just .... |
| 3 | ORTEGA: | Did he .... |
| 4 | SAMPSON: | Actually ....  There was actually ....  Sergeant |
| 5 | | Winterson was involved in the whole thing too but |
| 6 | | .... |
| 7 | ORTEGA: | His, the attorney's complaint was more along the |
| 8 | | lines that he was not allowed to see his client. |
| 9 | SPELLETTE: | He wanted to see his client. |
| 10 | SAMPSON: | He wanted to go back there and confer with his |
| 11 | | client and we explained to him that we don't have |
| 12 | | the facility for him to do that, but his client was |
| 13 | | not being asked questions that were, you know .... |
| 14 | ORTEGA: | Yes. |
| 15 | SAMPSON: | And he was on the phone.  His client was actually |
| 16 | | calling his cell phone while this was going on. |
| 17 | | And he was just being ....  He wasn't helping the |
| 18 | | situation.  I mean he was being a pain. |
| 19 | ORTEGA: | Was he handcuffed or was he just escorted to the |
| 20 | | back room?  Do you recall? |
| 21 | SAMPSON: | I think he was just escorted to the back.  I am not |
| 22 | | ....  I don't remember though.  Because they |
| 23 | | brought him in and he sat right next to the desk. |

Donald A. Brisson, Esquire - Page 7 of 9

1              And then he was taken in the back to be booked.

2 ORTEGA:       So when he got to the back and then at that time,

3              he had an opportunity to speak to his client at

4              that time?

5 SAMPSON:      Oh, I don't know because I was .... That's it.

6 ORTEGA:       Oh, you didn't escort him, you didn't ....

7 SAMPSON:      I didn't. I didn't. Yes.

8 ORTEGA:       Okay. You didn't go to the back room?

9 SAMPSON:      No. They took him back [0072] Sergeant Riberio.

10             Yes.

11 ORTEGA:      Okay. Based on what happened in your presence, do

12             you think the attorney's rights were violated in

13             any way?

14 SAMPSON:     No. No.

15 ORTEGA:      Okay. Do you have any questions?

16 SPELLETTE:   No.

17 ORTEGA:      Okay. There are no more questions and that will

18             terminate the interview.

Donald A. Brisson, Esquire - Page 8 of 9

**CERTIFICATE OF ACCURACY**

February 4, 2005

I hereby certify the preceding pages truly and accurately, to the best of my ability, represent designated portions of an audio-cassette pertaining to an Interview of Officer Claudia Sampson in the matter of Donald A. Brisson and the New Bedford Police Department, Division of Professional Standards, Case Number 1141, held at the New Bedford Police Department on June 24, 2003.

Joyce L. Reed

Transcriber

Donald A. Brisson, Esquire - Page 9 of 9