# EXHIBIT "F"

# New Bedford Police Department
# Division of Professional Standards

# Investigation of Complaint
# made by
# Donald A. Brisson, Esquire

## Case Number: 1141

## Transcript of Interview of:
## Sergeant Kristofer Winterson

## July 2, 2003

## Interview Conducted by:
## Detective Lieutenant Manuel Ortega

## Assisted by:
## Sergeant Troy Spellette

Transcriber
Joyce L. Reed
Post Office Box 222
West Wareham, MA 02576
Phone: 508-295-4366
eMail: jaytaper@aol.com

# DISCLAIMER

To allow ease of quoting and reading aloud from the transcript, utterances such as "uh," "uhm", and repetitive speech, stuttering, and the like, are not included in the transcription. Vernacular such as "gonna", "cuz", etc., is reflected herein in its proper form, "gonna", for example, will be transcribed as "going to", and so on.

Utterances such as "uh-huh" and "uh-uh", depending on whether spoken in affirmative or negative tones, are followed by the appropriate word — "yes" or "no" — encased in brackets depicting their meanings. For example if the speaker utters a non-word such as "Mm-hmm" in an affirmative tone it will be followed by the word "yes" encased in brackets and will appear as "Mm-hmm. [yes]", in the transcript.

... Interrupted speech, unfinished sentences, or lengthy pauses are designated by three (3) dots [periods] where the interruption occurs. Resumption of interrupted speech is also indicated by three dots.

[####]  A three or four digit number encased in brackets identifies a point on the audio tape where inaudible or indiscernible words were spoken or some sort of irregularity occurred on the audio tape. Searches — by number — can vary significantly as a result of rewinding.

[   ]  Brackets are also used to designate transcriber comments. For example the words "END OF SIDE ONE; TAPE ONE", "SIDEBAR", etc., are shown in brackets as they are transcriber comments and not part of the actual litigation audio record.

Donald A. Brisson, Esquire - Page 2 of 7

1
2                          **Cassette # 1 - Side # 1**
3
4 Sergeant Kristofer Winterson, first having been duly sworn, gave

5 the following statement:

6 ORTEGA:            For the record, today's date is July second. The

7                    time is approximately ten A. M. This is an

8                    Administrative Interview, taking place in the

9                    Division of Professional Standards of the New

10                   Bedford Police Department. The case is number

11                   Eleven, seventy-two. The lead interviewer is

12                   myself, Lieutenant Manuel Ortega. I am being

13                   assisted by Sergeant Troy Spellette. The subject

14                   of the interview is Sergeant Kris Winterson. For

15                   the record could you state your name, rank and your

16                   present assignment.

17 WINTERSON:        My name is Kristofer Winterson. I am a Sergeant

18                   with the New Bedford Police Department. My

19                   assignment is Communications in the Booking

20                   Division.

21 ORTEGA:           Okay. On October sixth, our records indicate that

22                   you were assigned as the Booking Supervisor. That

23                   would be the year two-thousand. This happened two

24                   years ago now, the incident. Is that correct?

| | | |
|---|---|---|
| 1 | WINTERSON: | Yes. |
| 2 | ORTEGA: | Okay.   On that day retired Officer Ned LeDuc |
| 3 | | arrested an Attorney Brisson.  Were you present for |
| 4 | | the arrest? |
| 5 | WINTERSON: | I wasn't present for the arrest. |
| 6 | ORTEGA: | Okay.  Can you tell me what you remember about the |
| 7 | | arrest or when you became involved in the arrest or |
| 8 | | .... |
| 9 | WINTERSON: | Okay.   I was called to the front lobby area by |
| 10 | | Officer LeDuc regarding an Attorney Brisson wanted |
| 11 | | to speak to one of his clients, who was under |
| 12 | | arrest in the Booking area.  I went up to speak |
| 13 | | with him.  He wanted to go back there and speak |
| 14 | | with his client and I refused to let him go back |
| 15 | | there.  We don't have any facilities for attorneys |
| 16 | | to speak with clients back there.  And he became |
| 17 | | enraged and so I wouldn't get into an altercation |
| 18 | | with him and argue with him any further, I told him |
| 19 | | that that was the bottom line.  He wasn't going to |
| 20 | | be allowed in there and I went back to the Booking |
| 21 | | Division because I did have a prisoner back there. |
| 22 | ORTEGA: | So when you left the front lobby, he was still |
| 23 | | there.  Who else was there?  Officer Ned LeDuc who |

1                I mentioned.  Do you remember anyone there?

2 WINTERSON:       I am not sure who was there.  And I didn't go right

3                back to Booking.  I went to Communications because

4                we had something going on there also.  There was an

5                officer booking a prisoner in Booking.  I had to

6                leave there to go out front when they called me

7                regarding this incident.  I went back to the

8                Communications Division for a few minutes.

9 ORTEGA:          [0131] already.  Tell me more about the attorney's

10               demeanor when you approached him.

11 WINTERSON:       Okay.  He was arguing with somebody in the lobby

12               when I got there.  And then when he saw me, he came

13               over to the door leading from the main corridor

14               going back to the Booking area from the lobby.  He

15               met me like, as soon as I came out the door there

16               by Firearms.  And he started carrying on about he

17               wanted to go back and see his client.  And I told

18               him that I couldn't let him go back there.  I was

19               trying to explain to him why.  He didn't want to

20               hear it.  He was getting very loud and verbally

21               abusive.  And I just basically left him there and

22               went back to I. D.s.

23 ORTEGA:          Okay.  For some time, later that morning you saw

Donald A. Brisson, Esquire - Page 5 of 7

```
 1                  him again?

 2 WINTERSON:       Yes. I did.

 3 ORTEGA:          Okay.  Could you tell me what happened?

 4 WINTERSON:       When I was in the Communications Division, I was

 5                  called by someone at the desk, I don't recall who

 6                  it was that called me, to tell me that I had

 7                  another prisoner in Booking.  When I went over

 8                  there, to the Booking area, it was the same

 9                  attorney that I had seen in the main lobby.  He was

10                  under arrest by Officer LeDuc and Officer LeDuc was

11                  booking him at the time.

12 ORTEGA:          What was his demeanor at this time?  How was ....

13 WINTERSON:       Quiet.  He was very quiet.

14 ORTEGA:          Did he say anything to you at that point?

15 WINTERSON:       He wanted his phone call and he made a phone call.

16                  That was basically it.  I didn't have any

17                  conversation with him after that.  And he was

18                  booked and taken to court.

19 ORTEGA:          Okay.  Do you have anything for him?  Okay.  That

20                  will end the interview.
```

Donald A. Brisson, Esquire - Page 6 of 7

**CERTIFICATE OF ACCURACY**

February 3, 2005

     I hereby certify the preceding pages truly and accurately, to the best of my ability, represent designated portions of an audio-cassette pertaining to an Interview of Sergeant Kristofer Winterson in the matter of Donald A. Brisson and the New Bedford Police Department, Division of Professional Standards, Case Number 1141, held at the New Bedford Police Department on July 2, 2003.

*Joyce L. Reed*

Joyce L. Reed

Transcriber

Donald A. Brisson, Esquire - Page 7 of 7

# EXHIBIT "G"

# New Bedford Police Department
# Division of Professional Standards

# Investigation of Complaint
# made by
# Donald A. Brisson, Esquire

## Case Number: 1141

## Transcript of Interview of:
## Sergeant Rita Riberio

## June 25, 2003

## Interview Conducted by:
## Detective Lieutenant Manuel Ortega

## Assisted by:
## Sergeant Mike Fierrera

Transcriber
Joyce L. Reed
Post Office Box 222
West Wareham, MA 02576
Phone: 508-295-4366
eMail: jaytaper@aoi.com

# DISCLAIMER

To allow ease of quoting and reading aloud from the transcript, utterances such as "uh," "uhm", and repetitive speech, stuttering, and the like, are not included in the transcription. Vernacular such as "gonna", "cuz", etc., is reflected herein in its proper form, "gonna", for example, will be transcribed as "going to", and so on.

Utterances such as "uh-huh" and "uh-uh", depending on whether spoken in affirmative or negative tones, are followed by the appropriate word — "yes" or "no" — encased in brackets depicting their meanings. For example if the speaker utters a non-word such as "Mm-hmm" in an affirmative tone it will be followed by the word "yes" encased in brackets and will appear as "Mm-hmm. [yes]", in the transcript.

... Interrupted speech, unfinished sentences, or lengthy pauses are designated by three (3) dots [periods] where the interruption occurs. Resumption of interrupted speech is also indicated by three dots.

[####] A three or four digit number encased in brackets identifies a point on the audio tape where inaudible or indiscernible words were spoken or some sort of irregularity occurred on the audio tape. Searches - by number - can vary significantly as a result of rewinding.

[   ] Brackets are also used to designate transcriber comments. For example the words "END OF SIDE ONE; TAPE ONE", "SIDEBAR", etc., are shown in brackets as they are transcriber comments and not part of the actual litigation audio record.

Donald A. Brisson, Esquire - Page 2 of 8

**Cassette # 1 - Side # 1**

1
2
3 Sergeant Rita Riberio, first having been duly sworn, gave the
4 following statement:

5 ORTEGA:        For the record, today's date is June twenty-fifth.
6               The time is approximately ten-thirty. This is an
7               Administrative Interview, taking place in the
8               Division of Professional Standards of the New
9               Bedford Police Department. The case is number
10              Eleven, forty-one. The lead interviewer is myself,
11              Lieutenant Manuel Ortega. I am being assisted by
12              Sergeant Mike Fierrera. The subject of the
13              interview is Sergeant Rita Riberio. Also present
14              representing the Union is Sergeant Steven Oliveria
15              For the record could you state your name, rank and
16              your present assignment.

17 RIBERIO:       Rita Riberio, Sergeant, School Resource Officers
18              Unit.

19 ORTEGA:        Okay. On October sixth, the year two-thousand, our
20              records indicate that you were working the B shift.
21              Would that be correct?

22 RIBERIO:       Yes.

23 ORTEGA:        Okay. Your assignment for that day, do you
24              remember what it was?

Donald A. Brisson, Esquire - Page 3 of 8

1  RIBERIO:       No.  I don't.

2  ORTEGA:        If I tell you that it was a street sergeant, would

3                 that be a safe assumption?

4  RIBERIO:       Yes.

5  ORTEGA:        Okay.  At approximately one, thirty that afternoon,

6                 Retired Officer Ned LeDuc arrested an attorney that

7                 was at the station, a Donald Brisson, for Trespass

8                 After Notice.  Do you recall that incident?

9  RIBERIO:       Yes.

10 ORTEGA:        Could you tell me what happened, to your best of

11                recollection, what you witnessed and what happened

12                in your presence?

13 RIBERIO:       Actually, I didn't become aware of the situation

14                until after Attorney Brisson was arrested.  I was

15                in the back in the station and I heard noise.  I

16                came out.  And he was placed under arrest by

17                Officer LeDuc.

18 ORTEGA:        Okay.  So when you first saw LeDuc and the attorney

19                where were they?  Were they still in the lobby or

20                were they already in the back towards the desk?

21 RIBERIO:       The [0061].  It was in the lobby.  In the lobby and

22                he was bringing, coming in the door.

23 ORTEGA:        He was coming in the door when you first saw them?

Donald A. Brisson, Esquire - Page 4 of 8

```
 1                 Okay.

 2 RIBERIO:        As much as I can recall.

 3 ORTEGA:         Okay.  Did you have a conversation with Officer

 4                 LeDuc on why the arrest, why it happened, why the

 5                 individual was arrested?

 6 RIBERIO:        To be honest, I can't recall [0064].  I don't even

 7                 remember.  I really don't.

 8 ORTEGA:         Okay.  Do you remember having a conversation with

 9                 the prisoner or anything like that?

10 RIBERIO:        No.

11 ORTEGA:         Do you remember the prisoner?

12 RIBERIO:        Yes.  I do.

13 ORTEGA:         Do you know him?

14 RIBERIO:        [0068].  I was [0069] from D-S-S.

15 ORTEGA:         Okay.  So you don't recall if you had any

16                 conversation with the officer or the prisoner about

17                 why he was arrested and so forth?

18 RIBERIO:        The only thing I remember ....  I know Ned said he

19                 was arrested because he was hollering and told to

20                 leave.  He wouldn't leave.  But that's all I can

21                 remember.

22 ORTEGA:         Okay.  What Officer LeDuc's demeanor at that time

23                 when he was talking to you, if you recall?
```

| | |
|---|---|
| 1 RIBERIO: | He was upset.  He said ....  I remember him saying, |
| 2 | "I kept telling him that he couldn't come in, that |
| 3 | he had to wait".  Something like that.  I remember |
| 4 | some of it but not all of it.  So I feel bad.  I |
| 5 | don't want to say anything that I don't remember a |
| 6 | hundred percent. |
| 7 ORTEGA: | Right. |
| 8 RIBERIO: | Because that's really quite some time. |
| 9 ORTEGA: | Yes.  How about the attorney?  Do you remember |
| 10 | anything about him at all?  Was he calm, cool, |
| 11 | collected?  Was he still insisting on yelling and |
| 12 | screaming? |
| 13 RIBERIO: | He was upset.  He was saying stuff.  I don't |
| 14 | remember what he was saying but he wasn't calm or |
| 15 | cool.  That's for sure. |
| 16 ORTEGA: | Okay.  Once they took him to the back, did you go |
| 17 | into the booking at all? |
| 18 RIBERIO: | No.  I didn't.  No. |
| 19 ORTEGA: | Was anybody else besides Ned LeDuc there, to the |
| 20 | best of your recollection? |
| 21 RIBERIO: | A lot of people there but I don't know who they |
| 22 | were. |
| 23 ORTEGA: | I don't have any more questions.  Do you have any |

Donald A. Brisson, Esquire - Page 6 of 8

1                   questions Sergeant Fierrera?

2 **FIERRERA:**      No.  No questions.

3 **ORTEGA:**        Okay.   Time is eleven, thirty-seven and that will

4                   conclude the interview.

**CERTIFICATE OF ACCURACY**

February 3, 2005

I hereby certify the preceding pages truly and accurately, to the best of my ability, represent designated portions of an audio-cassette pertaining to an Interview of Sergeant Rita Riberio in the matter of Donald A. Brisson and the New Bedford Police Department, Division of Professional Standards, Case Number 1141, held at the New Bedford Police Department on June 25, 2003.

Joyce L. Reed

Transcriber

Donald A. Brisson, Esquire - Page 8 of 8

# EXHIBIT "H"

# New Bedford Police Department
# Division of Professional Standards

## Investigation of Complaint
## made by
## Donald A. Brisson, Esquire

## Case Number: 1141

## Transcript of Interview of:
## Sergeant Thomas Conley

## June 24, 2003

## Interview Conducted by:
## Detective Lieutenant Manuel Ortega

## Assisted by:
## Sergeant Mike Fierrera

Transcriber
Joyce L. Reed
Post Office Box 222
West Wareham, MA 02576
Phone: 508-295-4366
eMail: jaytaper@aol.com

# DISCLAIMER

To allow ease of quoting and reading aloud from the transcript, utterances such as "uh," "uhm", and repetitive speech, stuttering, and the like, are not included in the transcription. Vernacular such as "gonna", "cuz", etc., is reflected herein in its proper form, "gonna", for example, will be transcribed as "going to", and so on.

Utterances such as "uh-huh" and "uh-uh", depending on whether spoken in affirmative or negative tones, are followed by the appropriate word — "yes" or "no" — encased in brackets depicting their meanings. For example if the speaker utters a non-word such as "Mm-hmm" in an affirmative tone it will be followed by the word "yes" encased in brackets and will appear as "Mm-hmm. [yes]", in the transcript.

... Interrupted speech, unfinished sentences, or lengthy pauses are designated by three (3) dots [periods] where the interruption occurs. Resumption of interrupted speech is also indicated by three dots.

[####] A three or four digit number encased in brackets identifies a point on the audio tape where inaudible or indiscernible words were spoken or some sort of irregularity occurred on the audio tape. Searches - by number - can vary significantly as a result of rewinding.

[    ] Brackets are also used to designate transcriber comments. For example the words "END OF SIDE ONE; TAPE ONE", "SIDEBAR", etc., are shown in brackets as they are transcriber comments and not part of the actual litigation audio record.

Donald A. Brisson, Esquire - Page 2 of 11

1
2                        **Cassette # 1 - Side # 1**
3
4  Sergeant Thomas Conley, first having been duly sworn, gave the

5  following statement:

6  ORTEGA:            For the record, today's date is June twenty-fourth.

7                     The time is approximately eleven o'clock.  This is

8                     an Administrative Interview, taking place in the

9                     Division of Professional Standards of the New

10                     Bedford Police Department.  The case number is

11                     Eleven, seventy-two.  The lead interviewer is

12                     myself, Lieutenant Manuel Ortega.  I am being

13                     assisted by Sergeant Mike Fierrera.  The subject of

14                     the interview is Sergeant Tom Conley.  Also in the

15                     room is Sergeant Oliveria representing the ....

16                     For the record could you state your name, rank and

17                     your present assignment.

18  CONLEY:            Thomas Conley, Sergeant, New Bedford Police

19                     Department.

20  ORTEGA:            On October sixth of the year two-thousand, our

21                     records indicate that you were assigned to the

22                     Third District Court.  Is that correct?

23  CONLEY:            Yes.

24  ORTEGA:            Okay.  On that, October sixth, two-thousand, two,

Donald A. Brisson, Esquire - Page 3 of 11

1          you arrested a Mister Ramos on a detainer from the

2          U. S. Navy.   Could you tell us how you were

3          notified about the detainer and what actions you

4          took to execute the detainer?

5  CONLEY:    I [0201], what I can recall.   I was informed that

6          he was AWOL from the Navy, when he arrived at the

7          Third District Court.  I guess they had a printout.

8          I am not sure but I think that there was a printout

9          that he was AWOL.    That was in the N-C-I-C

10         printout.   And then I got a call from one of the

11         Navy guys themselves in regards to him.   I got a

12         call while I was in the office.   And he wanted to

13         know if he was ...., if we could hold him for them

14         for a day or two.  I said, "Oh".  I said, "Listen

15         he is in court now.  You know, he's got his cases

16         that he's, you know, he's in front of the Judge

17         now".   I said, "So, I mean, the best I could

18         probably do for you is hold him till court is

19         over."  And he says, "Okay.  I will get a team

20         together right away.  So just hold him for me."  I

21         said, "Fine".  So that's when Chris Saunders came

22         in.  He says, "Hey".  He says, "They are going to

23         let that guy go".  I said, "What do you mean they

Donald A. Brisson, Esquire - Page 4 of 11

1        are going to let him go?"   "Well, he's all done.

2        His cases are all set, Third District Court.  They

3        are going to let him walk."  I said, "They can't

4        let him walk".  I said, "The Navy is coming down

5        with a couple of guys to pick him up."  So he said,

6        "Well, I don't know what you are going to do".  So

7        that's when I had the PT van meet me around the

8        back where they release him.  And after he was done

9        with the court, his business with Third District

10       Court, I held him till the Marines came down, two

11       Marine officers came down and took him away.  I had

12       him brought to the station of course.

13 **ORTEGA:**     Okay.   Did you see the paperwork that, you said

14       there was some paperwork involved?  Did you see

15       anything?

16 **CONLEY:**     I guess they thought they sent the paperwork down

17       with all his Complaint Application and everything

18       else.  I am not sure, like I said.  But I believe

19       there was some sort of printout from the N-C-I-C

20       computer.

21 **ORTEGA:**     How were you notified or how did you become aware

22       that there was a detainer?  I am trying to get this

23       clear.  Was it the phone call from the, from the

1              Navy person?

2 CONLEY:      Well I knew about it .... I knew about it before

3              the phone call.

4 ORTEGA:      Now I don't know if it was the paperwork that came

5              down or N-C-I-C or an officer let me know who

6              arrested him. I am not sure to tell you the truth.

7              I believe there might have been some, an N-C-I-C

8              printout or something. I am not really that sure.

9              But I know, while I was there in my office, I got a

10             call from one of the Navy guys and he said to hold

11             him and that he was going to come and .... He

12             wanted me to hold him for a day and a half. I

13             said, "Geeze, I can't do that. The best I can do

14             is to have the courts hold him ....

15 [End of Cassette # 1 - Side # 1]

16                    Cassette # 1 - Side # 2

17 CONLEY:      .... here till you come down and pick him up".

18             "Okay. Well, I will get a crew right away", he

19             says. "I will get a couple of guys together right

20             away". I said, "Okay. Fine". And then it was

21             later on in the afternoon or something ....

22 ORTEGA:      You wouldn't happen to know who that Navy guy was,

23             would you?

Donald A. Brisson, Esquire - Page 6 of 11

```
 1 CONLEY:       No.  But I know that two guys came down.  Two guys

 2               came down in Khakis.  Not khakis, camouflage.  I

 3               assume they were Marines and they whisked him away.

 4 ORTEGA:       Okay.  At that time when this was going on at the

 5               courthouse, you had a conversation with Attorney

 6               Brisson?

 7 CONLEY:       Yes.  I did.

 8 ORTEGA:       What was the conversation about?

 9 CONLEY:       He was down there when he was being released.  He

10               was down ....

11 ORTEGA:       Down, meaning down in the ....

12 CONLEY:       Yes, where they come in and go ....  They always

13               let them out the back door.

14 ORTEGA:       Right.  Okay.

15 CONLEY:       So he was down there too.

16 SPELLETTE:    You talking about the courthouse?

17 CONLEY:       The courthouse.  Yes.

18 SPELLETTE:    All right.

19 CONLEY:       So he says ....  So I asked him ....  Like I said,

20               I am not sure.  This was like two years ago, wasn't

21               it?

22 ORTEGA:       Yes.

23 CONLEY:       Was it two years ago?
```

Donald A. Brisson, Esquire - Page 7 of 11

| | | |
|---|---|---|
| 1 | ORTEGA: | Yes. |
| 2 | CONLEY: | About two years ago, something. I guess our |
| 3 | | conversation was something about the Navy wanting |
| 4 | | him. That he was AWOL. And I thought the court |
| 5 | | was going to hold him. And then he said, "No. He |
| 6 | | is free to go". Something to that. "And all his |
| 7 | | .... all that he had to do at Third District Court |
| 8 | | was done". Matter of fact they had given him his |
| 9 | | property back and everything else. They were going |
| 10 | | to release him. That is about it, that I can |
| 11 | | remember. |
| 12 | ORTEGA: | Did you ever inquire that day, why the courts |
| 13 | | didn't hold him or anything like that [0019]? |
| 14 | CONLEY: | I have no idea. I don't know why they would not |
| 15 | | hold him. But as far as I'm concerned, I was asked |
| 16 | | by the Navy to hold him. And as far as I'm |
| 17 | | concerned, they have their own set of rules. Third |
| 18 | | District Court has their own set of rules. |
| 19 | ORTEGA: | How many years did you work at the Third District |
| 20 | | Court? |
| 21 | CONLEY: | I don't know. Two years. Is it two years? |
| 22 | | Heading on to two years. |
| 23 | ORTEGA: | During that time period, did you ever have another |

Donald A. Brisson, Esquire - Page 8 of 11

1          incident with, with the Navy or any of the armed

2          forces with a detainer, where the same situation

3          occurred.

4  CONLEY:    No.  That was the only one that I remember.

5  ORTEGA:    That was the only one?

6  CONLEY:    Yes.

7  ORTEGA:    Okay.  Do you feel anyone .... Did you .... Did

8          anyone violated these guys rights, the attorney's

9          rights that day or the client's rights as far as

10         you know?

11 CONLEY:    The client's rights?

12 ORTEGA:    Yes.  Mister Ramos was his name.

13 CONLEY:    You mean using excessive force?  No.

14 ORTEGA:    No.  No.

15 CONLEY:    [0024] came walking in and that was it.  And now

16         that you mention it, I remember him telling me that

17         he was AWOL.  That he was AWOL from the Navy.  He

18         knew that he was AWOL.

19 ORTEGA:    [0031].

20 CONLEY:    There was no problem with it.  And that was it.

21         Then I let his lawyer know that he was going to

22         headquarters.

23 ORTEGA:    Sergeant, do you have any questions?

Donald A. Brisson, Esquire - Page 9 of 11

1  SPELLETTE:        No.

2  ORTEGA:           Okay.  That will conclude the interview.

3  CONLEY:           All right.

**CERTIFICATE OF ACCURACY**

February 3, 2005

    I hereby certify the preceding pages truly and accurately, to the best of my ability, represent designated portions of an audio-cassette pertaining to an Interview of Sergeant Thomas Conley in the matter of Donald A. Brisson and the New Bedford Police Department, Division of Professional Standards, Case Number 1141, held at the New Bedford Police Department on June 24, 2003.

*Joyce L. Reed*

Joyce L. Reed

Transcriber

Donald A. Brisson, Esquire - Page 11 of 11