# EXHIBIT "I"

```
              UNITED STATES DISTRICT COURT
           DISTRICT COURT OF MASSACHUSETTS

                   CIVIL ACTION NUMBER: 03-CV-12249-DPW
```

| | |
|---|---|
| DONALD A. BRISSON,<br>        Plaintiff<br>v.<br>CITY OF NEW BEDFORD and<br>NED K. LeDUC,<br>        Defendants | **SUPPORTING AFFIDAVIT<br>OF PLAINTIFF'S COUNSEL** |

I, James R. McMahon, III, Esquire, upon my oath, do depose and say as follows:

1. I have personal knowledge of the facts set forth herein, and I am competent to testify to the matters stated herein.

2. Where such knowledge is based upon information and belief, I will so state, and I believe the same to be true.

3. I am Counsel for the Plaintiff in the above-captioned matter, and I make this affidavit in opposition to the Defendants' Motion for Summary Judgment, and in support of the Plaintiff's Cross-Motion for Summary Judgment.

4. During the course of this litigation I made certain Discovery Demands upon the Defendants, and I received from them copies of cassette tape recorded statements made by five (5) police officers regarding this event to the New Bedford Police Internal Affairs (Division of Professional Standards) and I caused same to be transcribed by a commercial transcriber.

1

5.  Those statements by those five (5) New Bedford Police Officers were transcribed by Joyce L. Reed of Wareham, MA; and the transcripts of those statements are annexed to the Plaintiff's Exhibits as Exhibits D, E, F, G, and H.

SWORN and subscribed to under the pains and penalties of perjury this day, March 30, 2005.

*[signature]*
JAMES R. McMAHON, III

# EXHIBIT "J"

UNITED STATES DISTRICT COURT
DISTRICT COURT OF MASSACHUSETTS

CIVIL ACTION NUMBER: 03-CV-12249-DPW

```
* * * * * * * * * * * * * *
                           *
DONALD A. BRISSON,         *
              Plaintiff    *
                           *
v.                         *
                           *   PLAINTIFF'S SUPPORTING AFFIDAVIT
CITY OF NEW BEDFORD and    *
NED K. LeDUC,              *
              Defendants   *
                           *
* * * * * * * * * * * * * *
```

I, Donald A. Brisson, Esquire, first duly affirming as to the foregoing, do depose and say as follows:

1. I have personal knowledge of the facts set forth herein, and I am competent to testify to the matters stated herein.

2. Where such knowledge is based upon information and belief, I will so state, and I believe the same to be true.

3. I am the Plaintiff in the above-captioned matter, and I make this affidavit in opposition to the Defendants' Motion for Summary Judgment, and in support of the Plaintiff's Cross-Motion for Summary Judgment.

4. This is a civil rights action brought by me against the City of New Bedford based on a custom or usage (policy); and one of its police officers, Ned K. LeDuc, arising from the arrest, detention, arraignment, prosecution, and damages suffered by me, the Plaintiff, on October 6, 2000 and following, in New Bedford, MA.

1

5. On October 6, 2000, prior to noon, acting in my capacity as an attorney at law, I was representing a client, Steven Furtado, before the New Bedford District Court, David T. Turcotte, J., at which time my client was ordered released.

6. Shortly thereafter, the New Bedford Police took Steven Furtado into custody under obscure authority, and interrogated him at the New Bedford Police Station, located at 871 Rockdale Avenue, in New Bedford, MA.

7. I went to the New Bedford Police Station at approximately 1:12 P.M., on October 6, 2000.

8. As I was walking into the Police Station, I received a cell phone call from Steven Furtado, who said the New Bedford Police were asking him questions and wanted him to sign a document.

9. I concluded his cell phone call, I approached the desk officer, Ned K. LeDuc, (hereinafter referred to as "LeDuc"), who was behind a plexi-glass window, explained why I was there, and LeDuc arranged for me to speak with Sgt. Kristofer Winterson.

10. I spoke with Sgt. Winterson and advised him that I represent Steven Furtado, that the Court had released Steven Furtado, and that the New Bedford Police are not to interrogate Steven Furtado without me being present, nor ask him to sign any documents, and that I wanted to see and meet with my client.

11. Sgt. Winterson advised me that the New Bedford Police Department had no place where I could meet with my client, and

2

that to allow an attorney to visit with a prisoner would be a security risk, and that my request to meet with my client was denied.

12. Sgt. Winterson abruptly ended the conversation and left me standing in a secured area.

13. At no time during my meeting with Sgt. Winterson did I raise my voice or become irritate; and Sgt. Winterson did not tell me to leave the Police Station or threaten to arrest me.

14. I left the secured area on my own and again approached the desk officer, Ned K. LeDuc, and asked to speak with the person in charge

15. LeDuc told me that the commanding officer, Lt. Richard Netinho, (who I knew to be a former police prosecutor), was in charge, and that he would try and locate Lt. Netinho for me to talk to him, and for me to wait.

16. After receiving this information, I waited by the front doors of the Police Station with the family members of Steven Furtado; who were the only other people there at that time.

17. At approximately 1:27 P.M., while I was waiting in the Police Station public reception area, I received a second cell phone call from Steven Furtado stating that the New Bedford Police were still wanting him to sign a document, and that they were still asking him questions that he did not want to answer without me being present.

18. After that second cell phone call, I asked LeDuc if he found Lt. Netinho.

19. LeDuc said that he had just spoken with Lt. Netinho, and that he in fact was willing to see me when he gets here.

20. I raised my voice only loud enough for LeDuc to hear me through the plexi-glass.

21. At that point a female policeman, Officer Claudia Sampson, (hereinafter referred to as "Sampson"), said to me, "Who do you think you are?  Why don't you go stand in the fucking corner!"

22. I then looked surprised at Sampson and asked, "What did you say?"

23. Sampson then said to me, "You heard me, go stand in the fucking corner!"

24. I then replied to Sampson, "I ain't standing in no freakin' corner for nobody!"

25. Immediately after this exchange, LeDuc got up from his desk behind the plexi-glass, walked around a petition and went through two doors and into the public reception area, and told me, "Leave now or you will be arrested."

26. At that very moment, I received the third phone call from my client, and while I was speaking to him, in a calm voice I responded to Officer LeDuc, "Look, I hope you don't do that, because I don't want to get arrested; but I can't leave if you guys are still asking my client questions and wanting him to sign some kind of document;  why don't you just tell me what questions you want to ask, and what document you want signed?"

27. I said this because I had no idea what questions the police

4

were asking my client or what documents they wanted him to sign; however, LeDuc did not respond, but instead arrested me and charged me with trespassing in violation of G.L. c. 266, § 120.

28. At no time was I disrespectful to LeDuc; and at no time did he object to my conduct except to arrest me for trespassing.

29. After being placed under arrest, I underwent the booking process, was held locked up in custody, was then transported in restraints to the New Bedford District Court, in the paddy wagon with another detainee, placed in a holding cell downstairs in the New Bedford District Court, and then brought into the arraignment dock, where I was eventually arraigned in front of other lawyers, prisoners, and court employees who came in to watch, including other judges, and then I was released on personal recognizance.

30. LeDuc knew or should have known at the time that he arrested me that he did not own the premises, that he was not in charge of the premises, that he was not the person who has lawful control of said premises, and that he did not have all the elements of the crime of trespassing, and that I was not trespassing before or at the time of the arrest.

31. At no time during my presence at the New Bedford Police Station on October 6, 2000 did my conduct amount to any breach of the peace.

32. LeDuc had no authority under law, or as a matter of right, to arrest me; and LeDuc told me himself that he was not in charge

5

and that it was not up to him, and that Lt. Richard Netinho was in charge, and that Lt. Netinho was on his way into the station.

33. LeDuc was only a patrolman, and prior to him arresting me on his own authority, there were at least three (3) sergeants in that area of the police station at that time, Sgt. Kristofer Winterson, Sgt. Rita Riberio, and Sgt. Mark Stone, and LeDuc did not even discuss anything with them before arresting me.

34. During the ensuing time between October 6, 2000 and the dismissal of the criminal complaint on July 10, 2001, the New Bedford Police did not charge me with any other crimes; such as disturbing the peace or disorderly conduct.

35. The acts of LeDuc were negligent and wrongful, and also amount to unlawful arrest, unlawful imprisonment, assault and battery, interference with contractual relations and violations of my civil rights, in particular my liberty and property interests.

36. LeDuc had no lawful authority to arrest me, but did so under color of law in violation of Title 42 U.S.C. § 1983.

37. The wrongful and unlawful actions of LeDuc have caused injuries and damages to me.

38. It is obvious that the City of New Bedford, by its Police Department, maintained a custom or usage (policy) which interferes with attorneys performing their duties in the representation of clients, including my situation, based on Sgt. Winterson's explanation that there is no place for

6

attorneys to meet with their clients, and that to do so is a "security risk".

39. Prior to my arrest, I received several cell phone calls from my client, Steven Furtado, who was already in the custody of the New Bedford Police Department.

40. Steven Furtado was in the process of exercising his right to be represented by me, an attorney, at the time of his interrogation by New Bedford Police officers; and those officers obviously allowed Steven Furtado to exercise his right to make several phone calls to contact his attorney, me.

41. As the attorney for Steven Furtado, I was merely attempting to meet with my client at the New Bedford Police Headquarters.

42. I was informed by Sgt. Winterson that the New Bedford Police Department had no place where attorneys could meet with their clients, that it would be a security risk, and that my request to meet with my client was denied; even though my client, Steven Furtado, initiated the contact by calling me while he was in police custody.

43. This response by Sgt. Winterson amounts to an admission of custom or usage (policy) which violates the rights of criminal suspects to obtain Counsel prior to and at the time of police interrogation; and also the rights of attorneys, such as me, to perform our duties as attorneys at law at a crucial time of due process for both client and attorney.

44. By failing to provide any place and/or time for lawyers to meet with their clients, and by denying me the opportunity to

7

meet with my client, Steven Furtado, under the reasons advanced by Sgt. Winterson, the New Bedford Police Department maintains a custom or usage (policy) in violation of Title 42 U.S.C. § 1983, which is a negligent or wrongful act, and which violates and did violate my rights to perform my duties in exercising the constitutional rights of attorneys and criminal suspects.

45. I disagree with assertions in police affidavits that my conduct and demeanor was any thing other than courteous, respectful, and professional.

AFFIRMED and subscribed to under the pains and penalties of perjury this day, March 30, 2005.

_____
DONALD A. BRISSON