UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DONALD A. BRISSON,            )
    Plaintiff,               )
                            )        CIVIL ACTION NO.
        v.              )        03-12249-DPW
                            )
CITY OF NEW BEDFORD and       )
NED K. LEDUC,                 )
    Defendants.              )


MEMORANDUM AND ORDER

October 31, 2005

On October 6, 2000, attorney Donald A. Brisson went to the New Bedford Police Station expecting to meet with his client, who was in custody and undergoing booking procedures.  The booking supervisor denied Mr. Brisson's request to see his client.  When Mr. Brisson refused to leave after repeated requests, desk officer Ned K. LeDuc arrested him for trespassing.

Based on this incident, Mr. Brisson brings this action under 42 U.S.C. §1983 and state tort law against the City of New Bedford and Officer LeDuc.  The Plaintiff alleges first that he suffered injuries arising from New Bedford's policy or custom of denying attorneys their right to practice law and denying criminal suspects the right to an attorney.  Second, he alleges that New Bedford is vicariously liable for damages caused by Officer LeDuc's actions.  Finally, he claims that Officer LeDuc

1

is directly liable under a variety of different legal theories.

The parties have filed cross-motions for summary judgment. For the reasons discussed below, I will grant the motions of New Bedford and LeDuc for summary judgment and deny that of the Plaintiff.

## I. BACKGROUND

The Plaintiff is an attorney licensed to practice in the Commonwealth of Massachusetts.  His practice consists primarily of criminal defense, and he teaches a course on criminal due process at the University of Massachusetts.

On October 5, 2000, Steven Furtado ("Furtado") engaged the Plaintiff to defend him against charges of operating a motor vehicle without a license and a civil motor vehicle infraction. Furtado was being held without bail because the U.S. Navy had a warrant for his arrest for desertion.

At the arraignment on the morning of October 6, 2000, Judge Turcotte dismissed the motor vehicle charges and released Furtado, concluding that the court lacked jurisdiction to enforce the Navy's arrest warrant.  Immediately upon his release, however, Furtado was taken into custody at the Navy's request by Sergeant Conley of the New Bedford Police Department.  Sergeant Conley took Furtado to the Police Station at 871 Rockdale Avenue in New Bedford, Massachusetts, ("Police Station") for booking.

The Plaintiff arrived at the Police Station at approximately

1:30 PM, followed shortly thereafter by four of Furtado's family members.  Just as he entered the public area of the Police Station, the Plaintiff received a call on his cell phone from Furtado.  Furtado said that the officers were asking him questions and asking him to sign documents.  The Plaintiff told Furtado not to sign anything, that he was at the police station, and would see him shortly.

The Plaintiff then approached Ned K. LeDuc ("LeDuc"), the desk officer.  LeDuc, a retired police officer, was sitting behind a plexiglass window at a desk adjacent to the entry area of the station.  As desk officer, LeDuc was responsible for checking visitors into the station.  Visitors were not permitted beyond the entry area without authorization from an officer. LeDuc's role was to inquire as to the visitor's purpose and contact the appropriate officer.

The Plaintiff identified himself to LeDuc and requested to see Furtado.  In response, LeDuc contacted Sergeant Kristofer Winterson ("Winterson"), the Booking Supervisor and Communications Supervisor.  Winterson was responsible for overseeing the booking process for each arrestee.  His duties included ensuring that the charges matched the offense, the paperwork was complete, and the arrestee was prepared for transport to another facility.  Winterson had been an officer with the New Bedford Police Department since 1983.

LeDuc let the Plaintiff into a secured room where he met

3

with Winterson.  Winterson denied the Plaintiff's request to meet
with Furtado.  He told the Plaintiff there was no designated area
for attorney/client meetings in the Police Station, and the
booking area was not an appropriate place to meet because the
Plaintiff presented a "security risk."

The Plaintiff's demeanor during this meeting is disputed.
Winterson said in his affidavit that the Plaintiff immediately
confronted him "ranting and raving", demanding to see Furtado.
LeDuc claimed that he heard the Plaintiff raise his voice at
Winterson several times.  The Plaintiff claimed that at no time
during this meeting did he raise his voice or become irritated.
It is undisputed, however, that the Plaintiff became "frustrated"
when Winterson denied his request to meet with Furtado.

After the meeting with Winterson, the Plaintiff approached
LeDuc and asked to speak with the "person in charge."  LeDuc said
that he would try to locate the commanding officer, Lieutenant
Richard Netinhu, and the Plaintiff should wait in the public
area.  Once the Plaintiff returned to the public area, he
received another call on his cell phone from Furtado.  Furtado
said that the police were still questioning him and asking him to
sign documents, but that he refused to answer or sign without the
Plaintiff present.

The Plaintiff then went back to LeDuc, told him that his
client was being questioned, and asked when Lieutenant Netinhu
would arrive.  LeDuc responded that the Lieutenant was on his

4

way.  LeDuc claims that at this point, the Plaintiff was "loud, abusive, and yelling" in such a disruptive manner that he could not carry on with business.  The Plaintiff claims that he raised his voice out of frustration and to be heard through the plexiglass, but that he was not yelling.

Officer Claudia Sampson ("Sampson"), who had been standing at the desk, went out into the public area and told the Plaintiff to "go stand in the fucking corner!"  The Plaintiff said, "What did you say?"  Sampson replied, "You heard me, go stand in the fucking corner."  The Plaintiff responded, "I ain't standing in no freaking corner for nobody!" and refused to back away from the plexiglass.

LeDuc then asked the Plaintiff to leave or he would arrest him for trespassing.  When the Plaintiff refused to leave, LeDuc got up from his desk in order to enter the public area.  At the same time, the Plaintiff received another call from Furtado.  LeDuc then approached the Plaintiff and told him again to leave or he would be arrested.  The Plaintiff said he would not leave until he found out what was happening to Furtado.  LeDuc arrested him for trespassing.

LeDuc motioned for the Plaintiff to go into the booking area, where he went through the booking process.  While he was there, he learned from the officer who had booked Furtado that Furtado had been asked only routine booking questions, such as identification information, and had been asked to sign routine

forms, such as a Miranda warning and a receipt for his property.
Id. at 72-73.   Furtado had not signed the papers.

After booking, the Plaintiff was transported to the New
Bedford District Court and arraigned later that same day by Judge
Turcotte.   Judge Turcotte dismissed the original complaint and
remanded the case for a Show Cause hearing in front of a
magistrate judge.   The magistrate judge reissued the complaint,
but the charges were dismissed before reaching trial.

## II. STANDARD OF REVIEW

The moving party is entitled to summary judgment when "the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact." Fed. R.
Civ. P. 56(c).   Once the movant makes such a showing, the
nonmovants "may not rest upon the mere allegations or denials" of
their pleading, but "must set forth specific facts showing that
there is a genuine issue for trial."   Fed. R. Civ. P. 56(e); see
Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st
Cir. 1995), cert. denied, 515 U.S. 1103 (1995).

A fact is "material" if it has the "potential to affect the
outcome of the suit under the applicable law." Santiago-Ramos v.
Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000).
A "genuine" issue is one supported by such evidence that "a
'reasonable jury, drawing favorable inferences,' could resolve it
in favor of the nonmoving party." Triangle Trading Co., Inc. v.
Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (quoting Smith

v. F.W. Morse & Co., 76 F.3d 413, 428 (1st Cir. 1996)).
"[C]onclusory allegations, improbable inferences, and unsupported
speculation," are insufficient to establish a genuine dispute of
fact.  Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8
(1st Cir. 1990).

Cross-motions for summary judgment do not alter the basic
summary judgment standard, but rather require courts to determine
whether either of the parties deserves judgment as a matter of
law on facts that are not disputed.  See Adria Int'l Group, Inc.
v. Ferre Dev., Inc., 241 F.3d 103 (1st Cir. 2001); Wightman v.
Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996).
Thus, in deciding cross-motions for summary judgment, courts must
consider each motion separately, drawing inferences against each
movant in turn.  Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6
(1st Cir. 1997).

### III. DISCUSSION

The Plaintiff brings claims under 42 U.S.C. §1983 for
deprivation of two constitutional rights: the right, guaranteed
by the Fourteenth Amendment, of an attorney to practice his
profession, and the right, guaranteed by the Fifth and Sixth
Amendments, of a criminal defendant to the effective assistance
of counsel.  He also raises numerous claims against New Bedford,
as LeDuc's employer, and LeDuc himself, based on Massachusetts
law.  I will consider the §1983 claims before turning to the

state claims.[1]

## A. SECTION 1983 CLAIMS

Congress enacted § 1983 to protect the constitutional rights of citizens against infringement by state and local governments. Monell v. Department of Social Services, 436 U.S. 658, 670-71 (1978).[2]  In Monell, the Supreme Court established that a municipality may not be held liable for the acts of its employees under a respondeat superior theory.  Id. at 690.  Rather, a plaintiff seeking to sue a local governing body under §1983 must

---

[1] Before I proceed to analyze the claims, I note that New Bedford and LeDuc have jointly moved to strike certain portions of the Plaintiff's affidavit and Statement of Undisputed Facts. Specifically, they object to "Paragraphs 30-32, 35-38 and 43-40 [sic] of the Plaintiff's Affidavit and Paragraphs 6, 11, and 14 of the Plaintiff's Statement of Undisputed Facts on the grounds that these paragraphs are not based on personal knowledge and do not set forth facts as would be admissible in evidence as required by Fed. Civ. P. 56(e)."  They also move to strike paragraphs 6 and 40 of the Plaintiff's Affidavit, which state that Furtado was being interrogated, on the grounds that they contradict the Plaintiff's own deposition testimony.  Defendants' Motion to Strike at 1.

To the extent that the Plaintiff's Affidavit and Statement of Undisputed Facts offer legal arguments and conclusions, they are inadmissible, and I do not rely on them.  See Fed. R. Civ. P. Rule 56(e).  As for Paragraphs 6 and 40 of the Plaintiff's Affidavit, whether the facts establish that Furtado was "interrogated" is a legal question.  Therefore, the Plaintiff's legal conclusions on this matter will be stricken.  The Plaintiff did not oppose the motion to strike.

[2] Section §1983 provides, in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U.S.C. §1983.

prove that "official policy" or "governmental custom"  caused the alleged constitutional deprivation.  <u>Id.</u>  Because I find no constitutional deprivation, I do not address the "custom" or "policy" element.

1.   **The Plaintiff's Right to Practice Law**

The Plaintiff here claims that Winterson's refusal to allow him to meet with his client in person in the police station deprived him of his right to engage in the legal profession.

The Plaintiff cites no constitutional provision guaranteeing the right to practice law in this way.  The Supreme Court has recognized that the "liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized right to choose one's field of private employment." <u>Conn v. Gabbert</u>, 526 U.S. 286, 291-92 (1999).  However, this right to engage in one's chosen profession is subject to reasonable government regulation. <u>Id.</u> at 292.  A complete prohibition of the right to engage in one's chosen field may violate the Fourteenth Amendment, but "[t]hat right is simply not infringed by the inevitable interruptions of our daily routine." <u>Id.</u>

Winterson's refusal to allow the Plaintiff to meet face to face with his client in the police station clearly did not completely prohibit the Plaintiff from engaging in his chosen field as a licensed practicing attorney.  Winterson's actions did nothing to prevent the plaintiff from continuing along his chosen career path. <u>Cf., e.g.,</u> <u>In re Griffiths</u>, 413 U.S. 717 (1973) (invalidating on equal protection grounds a Connecticut law

9

barring resident aliens from admission to the state bar
association).  The question, then, is whether the Plaintiff
experienced a mere "brief interruption" or something more
substantial that might trigger the protection of the Fourteenth
Amendment.

New Bedford relies heavily and appropriately on Conn v.
Gabbert, 526 U.S. 286 (1999), to support its contention that the
Plaintiff suffered no constitutional deprivation.  In Conn, an
attorney brought a §1983 action against county prosecutors who
executed a warrant to search his person at the same time his
client was testifying before a grand jury.  Conn, 526 U.S. at
289.  Noting that a grand jury witness has no constitutionally
protected right to counsel, the Court held that the execution of
a search warrant, "whether calculated to annoy or even to prevent
consultation with a grand jury witness," was one of those
"inevitable interruptions of our daily routine as a result of
legal process, which all of us may experience from time to time"
and, consequently, did not violate the Fourteenth Amendment right
to choose one's vocation.  Id. at 292-93.

Conn is on point.  In this case and that, state actors
prevented the plaintiffs, both attorneys, from meeting with their
clients.  In each case, the period of time during which the
attorneys and clients were separated was relatively brief.[3]  In

---

[3] It is not clear exactly how much time passed between the
first phone call that the Plaintiff received from Furtado and the
third.  The Plaintiff testified that "[i]t wasn't a lot of
time...[T]hings happened fast."

each case, as I will address in more detail below, the clients
had no constitutionally protected right to counsel.  Indeed, the
Plaintiff here suffered less of an interference with his right to
practice law because he at least had access to his client via
telephone.

The Plaintiff has not distinguished <u>Conn</u>, or offered any
competing caselaw.  In the absence of any contrary authority, I
find <u>Conn</u> to be controlling, and I conclude that no reasonable
juror could find that the interference with the Plaintiff's right
to practice in this case amounted to a constitutional violation.

## 2.   <u>Furtado's Right to Counsel</u>

The Plaintiff alleges that New Bedford violated Furtado's
constitutional right to counsel "prior to and at the time of
police interrogation."  This claim cannot survive summary
judgment because the Plaintiff has no standing to raise such a
claim and, in any event, Furtado had no constitutional right to
counsel while he was undergoing routine booking procedures.

a.   <u>*Standing*</u> - Standing is a threshold question in every
federal case.  <u>Warth v. Seldon</u>, 422 U.S. 490, 498 (1975).  In
order to satisfy the "case or controversy" requirement of Article
III, a plaintiff must allege "such a personal stake in the
outcome of the controversy" as to warrant federal jurisdiction.
<u>Id.</u> at 498-99 (quoting <u>Baker v. Carr</u>, 369 U.S. 186, 204 (1962)).
It is well settled that even when the plaintiff has alleged
injury to meet the "case and controversy" requirement, "the
plaintiff generally must assert his own legal rights and

11

interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Id. at 499.

Third party standing has been recognized in some circumstances, e.g. when Congress has granted it by statute, when enforcement of a challenged restriction would indirectly violate a third party's rights, when the third party is unable or unlikely to assert her own rights. See, e.g., Sierra Club v. Morton 405 U.S. 727 (1972); Craig v. Boren, 429 U.S. 190, 193-104 (1976); Barrows v. Jackson, 346 U.S. 249 (1953). The Plaintiff, however, has not argued or presented any evidence to suggest that his assertion of Furtado's rights falls into one of the classic patterns or that prudential concerns weigh in favor of allowing him to assert Furtado's rights. Consequently, I find that the Plaintiff has no standing to raise the alleged infringement of Furtado's constitutional right to counsel. See Conn, 526 U.S. at 292-93.


b. *Right to Counsel During Booking* - Furtado had no right to have counsel present during the booking procedure. The Sixth Amendment right to counsel "attaches only upon the initiation of adversary judicial proceedings against the defendant, and thereafter the right applies to all critical stages of the prosecution, before, during, and after trial." Roberts v. Maine, 48 F.3d 1287, 1290 (1st Cir. 1995)(internal citations and quotations omitted). The Fifth Amendment guarantees a criminal suspect the right to counsel during custodial interrogation. See

<u>Edwards v. Arizona</u>, 451 U.S. 477, 482 (1981).

Neither Amendment, however, guarantees a criminal defendant a right to counsel during the booking process. <u>See</u> <u>Roberts</u>, 48 F.3d at 1290 ("the point at which the right to counsel attaches is when "formal charges" have been initiated or when the government has committed itself to prosecute")(internal citations omitted); <u>U.S. v. McLean</u>, 409 F.3d 492, 498 (1st Cir. 2005) (finding a "booking exception, which allows police officers to ask general background questions (name, date of birth, etc.) while processing a newly arrested individual").

It is undisputed that Furtado was asked and supplied background and intake information for routine booking purposes. He was also asked to sign a City of New Bedford Police Department Suicide Questionnaire and Record Checks form.  He refused to sign this form without his attorney present.  These questions and forms fall squarely within the booking exception to the Fifth Amendment right to counsel and, as no formal charges had been initiated, outside of the Sixth Amendment's protection.

## 3.  **Municipal Liability**

Because Plaintiff has not established the necessary element of a constitutional deprivation, his § 1983 claims against New Bedford may be rejected without reaching the question of New Bedford's policies and customs regarding the presence of attorneys during booking procedures.

### B. STATE CLAIMS[4]

The Plaintiff makes a number of claims under state law against both New Bedford and LeDuc.  He claims that New Bedford is vicariously liable for LeDuc's alleged negligence in arresting the Plaintiff, or in the alternative, that LeDuc is directly liable for false arrest, false imprisonment, assault and battery, interference with contractual relations, and violations of the Plaintiff's civil rights, in particular his "liberty interest." I will consider each claim in turn.

### 1.  New Bedford's Liability for Negligence

The Plaintiff seeks to hold New Bedford liable for LeDuc's allegedly negligent arrest of the Plaintiff.  Complaint at ¶¶ 32, 34.  Although the Plaintiff does not cite to it, the Massachusetts Tort Claims Act (Act) arguably provides the basis for such a claim.  Mass. Gen. L. ch. 258 et seq.  The Act "imposes liability on a public employer for a public employee's negligent act performed within the scope of his employment and relieves the public employee of liability." Schenker v. Binns, 18 Mass. App. Ct. 404, 404 (1984).[5]  However, the Act exempts

---

[4] Because the federal and state claims in this case derive from a common nucleus of fact and raise no novel or complex issues of state law, I will exercise supplemental jurisdiction under 28 U.S.C. §1367.  See Vera-Lozano v. Int'l Broadcasting, 50 F.3d 67, 70 (1st Cir. 1995).

[5] The Massachusetts Tort Claims Act, in part, provides: "Public employers shall be liable for injury or loss of property or personal injury or death caused by th negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances."

municipalities from liability for the intentional torts of its employees, including the tort of false arrest.  Mass. Gen. L. ch. 258 §10(c).[6]

New Bedford's liability, therefore, turns on whether the "true focus" of the Plaintiff's claim is LeDuc's negligence, covered by §2, or an intentional tort exempted by §10(c).  Doe v. Blandford, 402 Mass. 831, 838 (1988).  The legislature created §10(c) to insulate the government from liability only for intentional conduct that it had not authorized.  Id.  It follows that cases holding municipalities liable for negligence tend to allege or imply negligent supervision or training on the part of the municipality.  See, e.g., id. (finding that a claim that school committee members had, or should have had, knowledge of guidance counselor's assaultive behavior, and negligently hired and failed to supervise him, did not fall under §10(c)); Dobos v. Driscoll, 404 Mass. 634 (1989) (holding the state liable for the negligent supervision of a police officer who had a history of disciplinary problems when that officer abused a motorist during a traffic stop).

The Plaintiff makes no such negligent supervision and

_____

Mass. Gen. L. ch 258, §2.

[6] Mass. Gen. L. ch. 258, §10(c) exempts state government from liability for "any claim arising out of an intentional tort, including assault, battery, false imprisonment, false arrest, intentional mental distress, malicious prosecution, malicious abuse of process, libel, slander, misrepresentation, deceit, invasion of privacy, interference with advantageous relations or interference with contractual relations."

training allegations.  To the contrary, he argues that LeDuc
acted entirely on his own volition, "outside the scope of his
duty as a police officer."  A municipality could be liable for
the "negligence of defendant officers acting within the scope of
their duty," but Plaintiff does not make this claim.  <u>Lewis v.
Kendrick</u>, 944 F.2d 949, 953 (1st Cir. 1991).  Thus, although
§10(c) is to be read "narrowly against public entities asserting
it," <u>Forbush v. Lynn</u>, 35 Mass. App. Ct. 696, 699-700 (1994), the
"essential nature" of the Plaintiff's claim against New Bedford
is the intentional tort of false arrest.  <u>Schenker</u>, 18 Mass. App.
Ct. at 406.[7]

Since §10(c) immunizes New Bedford from tort liability in
this case, the remainder of my discussion will focus on LeDuc's
personal liability to the Plaintiff.

## 2.   <u>False Arrest and False Imprisonment</u>[8]

---

[7] I note that the Plaintiff also claims that LeDuc was
negligent in arresting the Plaintiff for trespassing.  Whether an
officer was negligent in making an arrest turns on whether there
was probable cause.  <u>See</u> <u>Lewis v. Kendrick</u>, 944 F.2d 949, 953
(1st Cir. 1991).  I discuss the issue of probable cause in detail
below with respect to the claims of false arrest and false
imprisonment.

[8] In this Memorandum and Order, I use the terms "false
arrest" and "false imprisonment" interchangeably.  Technically,
false arrest and false imprisonment are different torts.  For
example, a false imprisonment may be committed without an arrest.
<u>See</u> <u>Martell v. Chisholm</u>, 384 F. Supp. 1224, 1227 (W.D. Pa. 1974),
aff'd, 517 F.2d 1398 (3rd Cir. 1975).  In Massachusetts, however,
they are considered indistinguishable.  <u>See</u> <u>Lewis</u>, 944 F.2d at
954 (affirming lower court's instruction to the jury that "false
arrest legally constituted false imprisonment").  Conflating the
two also makes sense where, as in this case, there has been an
arrest.

The relevant discussion of false arrest addresses two main issues.  First, I evaluate whether a jury could reasonably find that this arrest violated Massachusetts law; and second, I consider whether LeDuc is entitled to qualified immunity.  See Santiago v. Fenton, 891 F.2d 373, 383 (1st Cir. 1989).

a.  *Violation of state law* - The elements of a false arrest claim are that "(1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the defendant had no privilege to cause the confinement." Calero-Colon v. Betancourt-Lebron, 68 F.3d 1, 3 n.6 (1st Cir. 1995). The first three elements are not in dispute.  Therefore, whether the Plaintiff's detention amounts to false arrest turns on whether LeDuc had a legal privilege to make the arrest.  See Nelson v. Cambridge, 101 F. Supp.2d 44, 48-49 (D. Mass. 2000).

The Fourth Amendment demands that an arrest be supported by probable cause.  Santiago, 891 F.2d at 383.  Massachusetts common law imposes the following additional requirements upon officers making warrantless arrests for misdemeanors:

> A peace officer, in the absence of statute, may arrest without a warrant for a misdemeanor which (1) involves a breach of the peace, (2) is committed in the presence or view of the officer, and (3) is still continuing at the time of the arrest or only interrupted, so that the offence and the arrest form parts of one transaction.

Commonwealth v. Gorman, 288 Mass. 294, 297 (1934)(internal citations omitted).  The burden is on the defendant to justify a warrantless arrest.  Guiterrez v. Massachusetts Bay

<u>Transportation Authority</u>, 437 Mass. 396, 409 (2002).

LeDuc arrested the Plaintiff for trespassing, a misdemeanor in violation of Mass. Gen. L. ch. 266, §120. There is no doubt that the alleged trespass occurred in LeDuc's presence and that it was continuing at the time of the arrest. Therefore, the questions for resolution are whether LeDuc had probable cause and whether probable cause for trespass arrest by a police officer requires a breach of the peace.

Officers have probable cause to arrest if "at the moment the arrest was made, ... the facts and circumstances within the [officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent" person in believing that the defendant had committed or was committing an offense. <u>Beck v. Ohio</u>, 379 U.S. 89 , 91 (1964).

Massachusetts defines trespassing, in pertinent part, as follows:

> Whoever, without right enters or remains in or upon the dwelling house, buildings, boats or improved or enclosed land, wharf, or pier of another..., after having been forbidden so to do by the person who has lawful control of said premises, whether directly or by notice posted thereon, ... shall be punished by a fine of not more than one hundred dollars or by imprisonment for not more than thirty days or both such fine and imprisonment.

Mass. Gen. L. ch. 266 §120. There is no question that the Plaintiff remained in the building of another -- the Police Station was the property of New Bedford. Thus, the issues for probable cause analysis are whether §120 applies to the Police Station, a public building, and whether LeDuc was in "lawful

18

control" of the Police Station at the time of the arrest.

The answer to the first question is straightforward. Section 120 clearly applies to public spaces.  See Commonwealth v. Egleson, 355 Mass. 259, 262 (1969) (holding that "another" in §120 includes the State and municipalities); Guitierrez, 437 Mass. at 411 (finding that although a train station is a place of public accommodation, police officers could order a member of the public to leave for good cause); Commonwealth v. Dowd, 62 Mass. App. Ct. 1115, 2004 WL 2924794 (Dec. 17, 2004).

The second question is more complex.  The Plaintiff argues that LeDuc was not in lawful control of the Police Station.  He points out that three officers of superior rank were in the immediate vicinity: Winterson, Sgt. Rita Ribero, and Sgt. Mark Stone.  But LeDuc was acting on behalf of and for the benefit of his employer, New Bedford, the owner of the Police Station.  His role as desk officer included the duty to screen visitors and regulate entry into the building.

The only reasonable conclusion is that LeDuc's position as desk officer, like that of a security guard, includes the ability to make arrests for trespassing.  See Commonwealth v. Hood, 389 Mass. 581, 590 (1983) (finding that a criminal trespass arose when defendants remained on private property after a security guard asked them to leave).  There is no evidence that LeDuc was required to obtain approval from superior officers with respect to the manner of addressing events in the public area or that another officer was responsible making such arrests.

Having established that LeDuc had probable cause to arrest, the final question for purposes of determining whether the arrest was lawful is whether the trespass must necessarily have involved a breach of the peace.

Massachusetts has, by statute, effectively eliminated the common law requirement of breach of peace as a precondition for police officers making a trespassing arrest. The trespassing statute reads, in pertinent part:

> A person who is found committing such trespass may be arrested by a ... police officer and kept in custody in a convenient place, not more than twenty-four hours, Sunday excepted, until a complaint can be made against him for the offence, and he be taken upon a warrant issued upon such complaint.

Mass. Gen. L. ch. 266, §120. This statute authorizes warrantless arrest for trespassing. Other statutes authorizing warrantless arrest, including the statute for false arrest, have been read to eliminate the common law requirement for breach of peace, while retaining the requirement that the offense be committed in the presence or view of the arresting officer. <u>Commonwealth v. Conway</u>, 2 Mass. App. Ct. 547, 552 (1974).[9] Because §120 contains

---

[9] Mass. Gen. L. ch 231, §94A is entitled, "Probable cause as defence [sic] in action for false arrest." It provides: "If a person authorized to make an arrest shall have probable cause to believe that a misdemeanor for which he may make an arrest is being committed in his presence, such probable cause shall be a defence [sic] in an action brought against him for false arrest or imprisonment." <u>Id.</u>

Section 94A explicitly sets forth the requirements for a warrantless arrest, and has been read to reflect the legislature's intent generally to exclude the requirement for breach of peace. <u>Commonwealth v. Conway</u>, 2 Mass. App. Ct. 547, 552 (1974). In light of this legislative intent, statutes that use less specific language have also been read to eliminate the

similar language, I will construe it similarly.

In sum, a reasonable jury could not find that LeDuc committed false arrest.  He had probable cause to make the arrest because the Plaintiff remained on the premises after LeDuc, who had lawful control, asked him to leave.  LeDuc satisfied the requirements for a warrantless arrest for a misdemeanor.

b.   *Qualified immunity* - LeDuc also asserts the defense of qualified immunity.  Gildea v. Ellershaw, 363 Mass. 800, 820 (1973), established a common law immunity for officers performing discretionary acts in good faith.[10]  On a motion for summary judgment brought by an official seeking qualified immunity, the inquiry for a district court is "whether a reasonable official could have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct."  Lowinger v. Broderick, 50 F.3d 61, 65 (1st Cir. 1995).   This analysis is "quite

----

requirement.  Id.  See, e.g., Mass. Gen. L. ch. 56, §57 (authorizing police officers to "arrest without a warrant any person detected in the act of violating" state election laws); Mass. Gen. L. ch. 272, §60 (authorizing the warrantless arrest and detention of unidentified persons who leave trash in a public area after being asked by an officer to remove it).

[10] "[T]he law of the Commonwealth should be, and therefore is, that if a public officer, other than a judicial officer, is either authorized or required, in the exercise of his judgment and discretion, to make a decision and to perform acts in the making of that decision, and the decision and acts are within the scope of his duty, authority and jurisdiction, he is not liable for negligence or other error in the making of that decision, at the suit of a private individual claiming to have been damaged thereby.  This rule is presently limited to public officers acting in good faith, without malice or corruption."  Gildea v. Ellershaw, 363 Mass. 800, 820 (1973).

generous." Id. It recognizes that "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present." Cookish v. Powell, 945 F.2d 441, 443 (1st Cir. 1991). Consequently, the analysis leaves room for officers to make "reasonable, although mistaken conclusion[s] about the lawfulness of one's conduct" without being subjected to personal liability. Id. It is worth noting that the analysis for qualified immunity is "entirely different" from that employed to evaluate the merits of a plaintiff's underlying claims, Lowinger, 50 F.3d at 65: "a plaintiff who is entitled to prevail on the merits is not necessarily entitled to prevail on the issue of qualified immunity." Cookish, 945 F.2d at 443. (internal citations omitted).

Given this generous standard, there is no genuine dispute of fact that LeDuc is entitled to qualified immunity, if his arrest decision were found somehow to be without probable cause. As discussed above, LeDuc was acting with discretion and within the scope of his duties when he arrested the Plaintiff. LeDuc stated in his affidavit that

> I entered the entry area and told Mr. Brisson to leave the
> Station or he would be arrested for trespass. Mr. Brisson
> refused and I again told him to leave or he would be
> arrested. Mr. Brisson again refused to leave and I placed
> him under arrest.

This alone establishes a reasonable belief on LeDuc's part that the Plaintiff was remaining on the premises in violation of §120.

See Lowinger, 50 F.3d at 65-65 (holding that a police officer was entitled to qualified immunity when he arrested an attorney for unlawfully recording a conversation without the officer's authorization, even though the attorney did not actually record the conversation).  It was also reasonable for LeDuc to believe that there had been a breach of the peace.  The Plaintiff admitted that he had raised his voice and that he was "loud."

The Plaintiff does not challenge the above-quoted portion of LeDuc's affidavit, nor does he allege that LeDuc acted in bad faith.  Therefore, Leduc would be entitled to qualified immunity, even if, as I find is not the case, his probable cause determination was erroneous.

3.   **Assault and Battery**

Assault and battery is "the intentional and unjustified use of force upon the person of another, however slight, or the intentional doing of a wanton or grossly negligent act causing personal injury to another." Sietins v. Joseph, 238 F. Supp. 2d 366 (D. Mass. 2003)(quoting Commonwealth v. McCan, 277 Mass. 199, 203 (1931).  In the context of an arrest, "the standard for determining whether force is reasonable for assault and battery claims is 'essentially the same' as the standard for determining if force is reasonable for Fourth Amendment excessive force claims." Id. (quoting Dean v. Worcester, 924 F.2d 364, 369 (1st Cir. 1999).  The standard is that "an officer authorized to make

an arrest may use such force as is reasonably necessary to effect the arrest." Dean, 924 F.2d at 369.

In this case, the Plaintiff has neither alleged nor provided any facts to suggest that LeDuc used any force or touched the Plaintiff in any way.  LeDuc arrested the Plaintiff verbally and motioned for the Plaintiff to follow him into the booking area. LeDuc did not put the Plaintiff in handcuffs.  A claim for assault and battery cannot stand where the officer used no physical force and the arrestee suffered no physical injury.  See Aponte Matos v. Toledo Davila, 135 F.3d 182, 191 (1st Cir. 1998)(finding no Fourth Amendment violation had been stated, let alone one unreasonable enough to overcome official immunity, when there was no arrest, no physical force used, and the plaintiffs sustained no physical injury).

A claim for assault alone, however, does not require physical touching or physical injury.  An assault is either an attempted battery or putting another in fear of an immediately threatened battery.  Commonwealth v. Gorassi, 432 Mass. 244, 247 (2000).  Neither of these claims, however, has merit on these facts.  First, there is no evidence that LeDuc intended to inflict bodily harm on the Plaintiff, so there can be no attempted battery.  See id. at 248.  Second, there is no evidence that LeDuc threatened to use physical force or put the Plaintiff in fear of imminent bodily harm.  Id.  The Plaintiff testified that he was "scared" when LeDuc threatened to arrest him for

trespassing.  But there is no evidence that he feared bodily injury, and mere fear of being arrested is insufficient to sustain a claim for assault.  <u>See</u> <u>Gorassi</u>, 432 Mass. at 249 ("what is essential is that the defendant intended to put the victim in fear of imminent bodily harm, not that the defendant's actions created a generalized fear or some other unspecified psychological harm in the victim.").

**4.   <u>Interference With Contractual Relations</u>**

The Plaintiff alleges that LeDuc interfered with his contractual relations, presumably a contract between the Plaintiff and Furtado for legal services.  In order to prove interference with contractual relations, the plaintiff must show that "(1) he had a contract with a third party; (2) the defendant knowingly interfered with that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means and (4) the plaintiff was harmed by the defendant's actions."  <u>Harrison v. Netcentric Corp.</u>, 433 Mass. 465, 476 (2001).

The first element is not in dispute.  The Plaintiff introduced himself to LeDuc as Furtado's attorney, and repeated several times that he wished to speak with his client.

The second element is not as easily resolved.  It is not clear whether LeDuc knowingly interfered with the contract between the Plaintiff and Furtado.  LeDuc claims that he arrested

the Plaintiff because the Plaintiff's "disruptive behavior" prevented LeDuc from performing his duties as desk officer, not because he intended to prevent the Plaintiff from fulfilling his contractual duties to Furtado.  The fact that LeDuc allowed the Plaintiff to have three phone calls with Furtado supports this view.  On the other hand, when LeDuc made the arrest, he cut short the Plaintiff's third phone conversation with Furtado.

This potentially material dispute of fact as to the second element need not be resolved by a jury, however, because the Plaintiff has produced no evidence to support elements three and four.  Where, as here, the claim is asserted against an individual official of an employer, the Plaintiff must show that the "'controlling factor' in the alleged interference was 'actual' malice; 'implied' malice is not sufficient." Weber v. Community Teamwork, Inc., 434 Mass. 761, 781 (2001) (internal citations omitted).  The requisite "malice" in this context is "a spiteful, malignant purpose, unrelated to the legitimate corporate interest of the employer." Id. at 782.  The Plaintiff has neither alleged nor offered any evidence to suggest that LeDuc acted with such malice.

With respect to the fourth element, the Plaintiff has presented no evidence of harm, financial, reputational, physical or psychological, as a result of LeDuc's alleged intentional interference with the contract between the Plaintiff and Furtado.

26

5.   **Civil Rights Violations**

The Plaintiff alleges that LeDuc violated his "civil rights,
in particular, his liberty interest."  As LeDuc points out, the
Plaintiff refers to no specific federal or state constitutional
provision as the source of his claim.  The words "liberty
interest" suggest Due Process, but because the Plaintiff's
constitutional challenge arises from a warrantless arrest, it is
properly analyzed under the Fourth Amendment.  Westover v. Reno,
202 F.3d 475, 479 n.4 (1st Cir. 2000).

A warrantless arrest is valid under the Fourth Amendment if
the officer had probable cause.  Gerstein v. Pugh, 420 U.S. 103,
113-114 (1975).  As shown in the preceding discussion of the tort
of false arrest, there is no dispute of material fact as to
whether LeDuc had probable cause to arrest the Plaintiff for
trespassing.  Thus, the Plaintiff's claims against LeDuc for
federal civil rights violations cannot stand.

In addition to probable cause, Massachusetts law requires
that in a warrantless arrest for trespassing, the crime be
committed in the presence or view of the officer and is still
continuing at the time of the arrest.  Gorman, 288 Mass at 297.
As discussed in detail above, LeDuc satisfied these requirements.
Moreover, even if LeDuc had violated the Plaintiff's state
constitutional rights, LeDuc is entitled to qualified immunity.

## IV. CONCLUSION

For the reasons set forth more fully above, I GRANT the Defendants' motions for summary judgment.


/s/ Douglas P. Woodlock
_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE